FRANKFORT BANK *versus* BENJAMIN JOHNSON & al.

A contingent liability affects only the credibility, not the competency of a witness.

To a commentary of the presiding Judge upon the testimony, whether perfectly correct and appropriate or not, a bill of exceptions cannot be taken. Juries are not bound by such commentaries, and the Court never refuses to counsel the opportunity, in a proper manner, before the cause is fully committed to the jury, to correct any misapprehension or misstatement of the testimony.

A settlement with the cashier of a bank, made by the directors, is not conclusive upon the bank, if the cashier was guilty of fraud in procuring it to be made.

The directors of a bank have authority to make a settlement with the cashier, whose accounts exhibit a deficit in the funds.

The directors of a corporation have no power to make a donation from, or misappropriate, its funds in violation of the laws and rules regulating its mode of action.

But the fraudulent conduct of the directors of a bank, in making a settlement with the cashier, would not annul or make it void, unless the cashier was also guilty of fraud.

Corporations are subject to the same laws in relation to the acts of their agents, which are applied to individual persons with respect to the acts of agents of their appointment.

DEBT on the bond of Johnson, as principal, and of the other

defendants, as his sureties, to the Frankfort Bank, dated Oct.
9, 1839. The case came before the Court on exceptions in
behalf of the bank, to the rulings and instructions of TENNEY
J. presiding at the trial, and on a motion to set aside the ver-
dict, as against evidence, and against the weight of evidence.
The facts sufficiently appear in the opinion of the Court, as do
also the rulings and instructions of the Judge, to which excep-
tions were taken.

The case was concisely argued orally by

*Kelly*, for the plaintiffs : — and by

*Hathaway* and *Hubbard*, for the defendants, — and much
at length, in a written argument, by

*Merrill*, for the plaintiffs.

The opinion of the Court, WHITMAN C. J. holding the Court
for jury trials in the County of Washington, at the time of the
argument, and taking no part in the decision, was drawn up
by

SHEPLEY J. — This is a suit against Johnson, as principal,
and others, as his sureties, on his official bond, as cashier of the
Frankfort Bank, made on October 9, 1839. Two breaches are
alleged. The first, that the cashier "had received the sum of
$8000, of money belonging to the bank, and given no credit
for the same, nor in any way accounted for it in the books of
the bank." The second, that "he had improperly included in
a settlement an item of interest on the notes and bills of said
bank, over due, in order to make up his balance of assets equal
to the liabilities, and equal to his leger account of notes and
bills," amounting to the sum of $2273,24. The defendants
obtained a verdict in their favor. The case has been present-
ed by a bill of exceptions, and on a motion to set aside the
verdict as against the weight of evidence ; and it has been
argued orally, and by one of the plaintiffs' counsel also, in
writing.

The motion to set aside the verdict will be first considered.
The capital of the bank was $50,000. The deposition of the

cashier, which had been taken to be used in actions between several other parties, was introduced by the plaintiffs in this case, as testimony against him; and thus introduced, it will be entitled to the usual confidence, so far as his statements are not contradicted by other testimony. It appears from those statements, and from other testimony, that the bank was embarrassed; that its assets were not available as cash; that its bills had frequently been presented and payment demanded, when the bank had no funds to pay them; that as early as the month of December, 1839, the bank had mortgaged property for security to the Suffolk Bank to the amount of 11 or 12,000 dollars; that on or about Jan. 20, 1840, it procured a loan of Read & Co. of Boston, on notes for $8,000, signed by the president and others and indorsed by the bank; that during the following spring or summer a majority of the directors resorted to the improper and unwise course of purchasing its own stock, by using its discounted notes and other paper, with the intention to sell it again, apparently hoping by that operation to obtain cash or paper of more value, than it then held; that to effect this purpose the president of the bank was authorized to use, and did use, $25,400 of its paper in the purchase of 308 shares of its own stock; that a contract was made, on July 30, 1840, by the president, with Henry Roop for the sale to him of 400 shares of its stock at par, to be paid for by $2,500, in cash, by $5,000, in acceptances at thirty, sixty, and ninety days, which appear to have been paid, and by $32,500 in the notes of Roop with a surety, which proved, as might have been anticipated, to be worthless. This contract was executed on the second day of September, following; and the whole of these proceedings were approved by a majority of the directors. A new cashier was appointed, and the former cashier retired on that day, after having, as he states, delivered to the new cashier, or to the president, all the assets and property of the bank, except some of the bank books, which he refused to surrender, till his official bonds were cancelled. A settlement appears to have been made with him on that day, and an account exhibiting the assets and liabilities of

the bank to have been made out and signed by him and the president, which was the basis of that settlement. The bond declared upon appears to have been then cancelled on its face, and the names of the principal and sureties, to have been erased, that the cashier might exhibit it in that state to his sureties as proof of their discharge. That settlement was approved by a vote of a majority of the directors. The argument correctly states, that this vote does not authorize the cancellation of the bond, or the erasure of the names. The president testifies, however, that he did it in the presence of the other directors, and the cashier testifies, that two other directors, making a majority of the existing board of directors, were present and agreed to it. The whole of the proceedings therefore, by which the sureties were discharged, appear to have been the deliberate acts of the plaintiffs, acting in the only manner, in which they could legally act by their regularly constituted officers. Such a settlement, with such a disposition of the bond, should surely be sufficient to discharge the sureties, unless it was procured by fraud, or unless there be satisfactory proof, that by some error, not then known and noticed, the cashier did not account for all the property of the bank, which had been in his possession. The plaintiffs now insist upon their right to recover upon both of these grounds. As it respects the alleged fraud, it must be a fraud in relation to, or touching that settlement, which will destroy its effect; and not frauds committed by the officers of the bank upon the stockholders or otherwise, having no connexion with that settlement. Fraudulent acts, not connected with it, can only be used as tending to lead a Court or jury to infer fraud in the settlement, because the parties to it had been guilty of previous frauds, exhibiting a settled purpose to defraud the bank or its stockholders, whenever a favorable opportunity should occur. The written argument for plaintiffs does not make this most important distinction. Important, because a Court or jury cannot be authorized, without proof of such a formed design, to infer, that parties have been guilty of a fraud in one transaction, because they have been guilty of it in others wholly uncon-

nected with that one. And however extensive may have been the frauds in other matters, an examination of the testimony presented to the Court, is far from exhibiting any such evidence of fraud in making that settlement, especially on the part of the cashier, as would lead to the conclusion, that the jury must have acted under the influence of some bias or prejudice in finding a verdict for the defendants, on the ground, that the cashier had not been proved to have been guilty of any fraud in making it.

The next ground, on which the plaintiffs claim to have the verdict set aside, is, that there was full and satisfactory proof, that a mistake was made in that settlement, by which the cashier did not account for the two items claimed in this suit. The most material testimony relating to each of the two items will be examined separately. The claim to recover the sum of $8000, arises out of the loan procured from Read & Co. The cashier receipted for those notes to the president, and much reliance is placed upon the effect of that receipt. It should not however bind him, much less his sureties, if it should appear, that he did not in fact receive those notes as a part of the funds of the bank. And the testimony is quite satisfactory, if not wholly conclusive, to prove, that he did not in fact receive them. It appears, that he was ordered by the directors to indorse them in behalf of the bank, and that having done so, they were retained by the president, and by him passed to Read & Co. to procure funds for the bank; that they remained outstanding, unpaid, and not within the control of the cashier, at the time of the settlement. He does not appear to have had possession of them at any time, except for the mere purpose of obeying an order of the directors by indorsing them. The receipt for them appears to have been improperly required, and to have been given through a misapprehension of duty and of right. This disposes of so much of the testimony, as would charge him with them solely on the ground of that receipt. He would however be chargeable with, and should account for, any proceeds of them when received. There is a document, which shows, that he did, or

should have received, what was obtained of Read & Co. for them. And that is the settlement made by the cashier with the president on February 20, 1840. By that document it appears, that the president received of Read & Co., for those notes, the sum of $7166,64, and that he accounted for it, with the cashier. And as it appears from the settlement made with the cashier, that the notes were not included in the list of the liabilities of the bank, there would appear to be a deficiency of assets and charges on the other side of that account, equal to the amount of those notes. Thus a loss is exhibited, for which the cashier should account, unless that loss occurred in the dealings of the bank without his fault; and if so, it should have been exhibited in his accounts. Mr. Alden testified on this point, in substance, that he had examined the accounts upon the bank books, that the cashier's account was balanced, and that a memorandum on the book exhibited the four $2000 notes, due to Read & Company, as unpaid and not included in the settlement. "That the $8000 was secured in part by State stock, and so far is put in twice." That State stock appears by the account to have amounted to $2000, which would reduce the apparent deficit, if Mr. Alden be correct, to $6000. Mr. Bradbury states, in substance, the same state of facts respecting these notes; that he examined the books; that there appeared to be a large deficiency in the cash account; that he found the cashier's account deficient by the amount of those notes and the other item of interest; and that the books were loosely kept. Both these witnesses had been cashiers of banks, and both state, that they do not know, or that they have no reason to suppose, that the directors made a mistake in their settlement with the cashier. Opposed to this is the testimony of the president, that there was at the time of the settlement, a full investigation which satisfied him, that all was correct; that he is perfectly satisfied now, and was then, that there was no deficiency; that he "should have supposed, if there was nothing but the account on the book, there was a deficiency of $8000; but from what was before the directors, it was clear, the whole

was accounted for; and that he "knows there was no deficiency in Johnson's account." Rich, another director, testified, that he was present at the settlement; that he examined partially the accounts, and discovered no deficiency; that he knew of no money received by the cashier and not accounted for. The cashier, in his testimony, introduced by the plaintiffs, states positively, that there was no deficiency. The witnesses do not state when, or from what cause, the deficit in the accounts originated. So far as it respects their testimony, it might have arisen, if it existed, from the misuse or subtraction of the funds by the cashier, before these sureties became liable. Or it might have happened since that time by the action of the bank in its negotiations to attempt to sustain its credit, and in the purchase and sale of its stock, without the fault of the cashier, except the neglect to charge such losses in his accounts. No one of the witnesses speaks particularly of the profit and loss account, or states the items, of which it was composed, while these sureties were liable. The account settled only exhibits a loss in that account to the amount of $660,11. There is reason to believe, that no considerable amount of losses could have been charged to that account, since this bond was executed. For the amount once charged could only be diminished by the credit of profits; and how there could have been much profit to credit is not perceived; when it could only be derived from its paper, stated not to be available as cash, and $25,400 of which appears to have been exchanged, as before stated, for its own stock, and on the remainder of which the interest appears to have remained unpaid at the time of settlement, to the amount of $2273,24. If therefore it should appear, that the bank suffered losses during that time, without the fault of the cashier, to the amount of the deficit exhibited by the accounts, which ought to have been charged to swell the account of profit and loss, it would prove, that the plaintiffs can have no just claim upon the cashier and his sureties to make up that deficiency, which, if Mr. Alden be correct, as before stated, amounted to $6000.

The documents do show, that the bank lost without his fault

the discount on the notes for $8000, amounting to $833,36, the sum of $7166,64, being all that was received for them. The president in his account with the bank, settled on September 2, 1840, makes this remarkable charge against the bank, and it was allowed. "For 308 shares of the capital stock of this bank, purchased in with the $25,400 of the debts due the bank, by the direction and assent of the directors, $30,800." The bank therefore appears to have paid him $30,800, for its own stock, purchased by him with its own funds, for $25,400, thereby suffering a loss of $5,400. There is another charge also in the same account, "for this amount of bills of this bank, less the discount, delivered to H. Roop, $25,000." The term, "less the discount," is believed to have been used to indicate, that the whole apparent amount of the paper delivered was not charged, but a sum less by the amount of a discount allowed upon it. If this be the true explanation, the bank must have sustained a loss on that sum to the amount of the unknown discount, which it is not improbable, may have been two per cent. because Roop in his contract engages, that the bills of the bank shall be taken up in the city of New York at a discount of not more than two per cent. But if this last item of loss, resting rather upon probability than proof, be rejected, there will remain apparently lost by the bank, without the fault of the cashier, an amount larger, than the deficit according to the testimony of Mr. Alden. In addition to this, there is the consideration, that after this bond was executed, the directors, knowing the state of the bank, had the most urgent reasons for a careful examination of its condition, and the state of its funds and resources ; and it would have been very difficult for the cashier to have misapplied or subtracted during that time such an amount without their knowledge, and especially without the knowedge of the president. And it could not have been believed that the cashier could have lost, wasted, or subtracted, such an amount without a knowledge of it. It would therefore have been difficult for the jury to have found a verdict for the plaintiffs without coming to a conclusion, that the president and cashier had committed deliber-

ate perjury. This they could not have been expected to do, when the documents presented to them exhibited the losses alluded to as occurring without the fault of the cashier. It may be, that those apparent losses may be explained in such a manner, as to leave the cashier without excuse for the apparent deficit in his account; and it may be, that a more perfect examination would prove, that the only error or fault on his part consisted in his neglect to charge those or other losses to the account of profit and loss. However this may be, the Court can only examine the case, as now presented, without the aid of the bank books.

As it respects the other sum claimed, the argument for the plaintiffs assumes, that the proof was conclusive, that "interest on the bills and notes" to the amount of $2,273,24, was charged by the cashier and included in that settlement. How is that fact established? The account settled contains this item, " for notes and bills discounted, $36,990,82." If charged to the bank it was contained in that item. The only witness, who appears to have testified respecting it, was Mr. Bradbury. According to the bill of exceptions, he stated, that "in the notes and bills discounted the columns were not added up; interest cast on notes and bills to Sept. 2, 1840. There was $2,273,24, interest on bills and notes, which made the amount carried into the trial balance; the face of the notes was only entered, being $36,987,66, without any interest; and the account was deficient the amount of the interest aforesaid, and the four $2000 notes, as appeared on the books." If this witness stated correctly, that the face of the notes without any interest, amounted to $36,987,66, as the cashier charged the bank for them in the account settled but $36,990,82, there could be in that charge an excess of only $3,16. The witness also stated, that the item of interest "made the amount carried into the trial balance," and that the account was deficient to that amount; but he appears to have stated it to be so, "as it appeared on the bank books." And if by "the trial balance" the witness intended, as is probable, to refer to one contained in the bank books, there would be nothing inconsistent in the

testimony. And if he did not, it is not perceived, how those two statements can be reconciled; and in such case the testimony would afford no satisfactory proof, on which a verdict could be found for the plaintiffs for this part of their claim. The result of a careful examination of the testimony is, that there is no just ground to believe, that the jury conducted improperly in finding a verdict for the defendants, and that the Court would be wholly unauthorized to set it aside.

The questions of law presented by the bill of exceptions remain to be considered. It is contended, that Benjamin Shaw was not a competent witness, because he was responsible to the bank for his negligence and misconduct in making the settlement and cancelling the bond. This objection assumes it to be a fact already proved, that he had been guilty of them. Whatever may be the result of this suit, he will not thereby be relieved from such liability. A verdict for the defendants would not be legal testimony in a suit against him to prove, that the settlement was correctly made, or that the bond was properly cancelled, because it could only be matter of record in a suit between other parties. It has been long settled, that such a contingent liability affects only the credibility, not the competency, of the witness. In the case of the *Union Bank* v. *Knapp*, 3 Pick. 96, the clerk, who testified that he made the mistake, which occasioned the suit, and that, if the money should be lost, he would sell his house or any thing else, if required, to pay it, was held to be a competent witness for the bank. It is also contended, that he was interested in the event of this suit, because certain depositions, taken at his expense, to be used in this and other suits, would be taxed in the bill of costs recovered by the defendants in this case, if they should prevail, and that Shaw would thereby be entitled to the whole expense, and to call upon Johnson for it, instead of the proportion agreed to be paid. But no such result would follow. Their agreement respecting the payment of that expense would not be altered or affected, nor could either of them obtain any new rights, by the use which might be made of them by either of the parties.

The next objection is to the instruction, "that the jury would be authorized to presume, the directors knew of the deficiency, if it appeared distinctly upon the books, unless the plaintiffs satisfied them, that the directors did not know of such deficiency." It is said, that this was equivalent to withdrawing the testimony of the two directors entirely from the jury. It is not perceived, that it could have such an effect, unless the jury should conclude, that their testimony disclosed such a want of intelligence, as to render it unworthy of their confidence.

The next complaint relates to the instruction, "that if the account was imperfect, it did not follow, that the deficiency was not made up on settlement, and might be paid without its appearing on the books." The truth of this, as an abstract proposition, cannot be denied ; and the jury were to judge, whether it was applicable to the testimony introduced. If it be alleged to be an unfair commentary upon the facts, juries are not bound by commentaries upon the facts, nor do they consider themselves to be. They will judge, whether they are founded upon a misapprehension, or even upon a perversion of the facts, if such a case may be supposed, and will give them such weight only, as they may deserve. The Court never refuses to counsel the opportunity in a proper manner to correct any misapprehension or misstatement of the testimony ; and the proper time to do it, is before the cause is fully committed to the jury. To such commentaries upon the testimony, whether perfectly correct and appropriate or not, a bill of exceptions cannot be taken. *Jackson* v. *Carver*, 4 Peters, 80 ; *Ex parte* Crane, 5 *Idem*, 198. These observations apply not only to this objection, but to several other remarks made by the presiding Judge upon the testimony. To the one contained in the next cause of complaint, "that he was not aware, that the plaintiffs had offered any evidence, which they relied upon to show fraud ;" and to those relating to the crippled condition of the bank, to the intelligence of a witness, and to the probability, that he would suffer the amount claimed in this suit to escape his attention, or that it would be unnoticed

by the other directors ; to the expression of his own opinion, that he could hardly think so, and to his allusion to the argument of the plaintiffs' counsel.

The next cause of complaint, so far as it has not been already noticed, is found in the instruction, "that if the settlement was obtained, when there was a deficiency, by the fraud of the cashier by imposing upon the directors, or they aided him in the fraud, the plaintiffs could recover. But fraud was not to be presumed, but might be proved by circumstances more or less remote." This instruction, so far as it embraced the matters connected with the settlement, was favorable to the plaintiffs, giving to them the benefit of any testimony tending to prove, that the settlement was under such circumstances procured by the fraud of the cashier acting separately or with the aid of the directors. If the counsel did not consider it to be sufficiently comprehensive to embrace every possible mode, in which the cashier might have been guilty of fraud in that settlement, they should have requested more full instructions. There can be no doubt, that the law as stated, was correct.

The last and most material cause of complaint, as found in the instructions, is, "that the vote of the directors of September 2, 1840, and the cancellation of the bond, if made in the presence of the directors there present, was conclusive against the plaintiffs, unless the plaintiffs had satisfied the jury beyond a reasonable doubt, that the settlement was made through mistake, or ignorance of a deficiency, which actually existed ; that if there was a deficiency, and the directors had full knowledge of it, and no fraud was practised by the defendant, the plaintiffs could not recover, as it was competent for the directors to allow the cashier such sum, as they pleased, if it were ten thousand dollars, as between them, and if so, and a settlement made without fraud of defendants, the settlement would be a defence." And that "no fraud in the directors would annul or avoid the settlement unless participated in by Johnson." It will be necessary to examine separately the legal propositions contained in the different clauses or sentences. That respecting the vote of the directors and the cancellation of the

bond could not have been understood by the jury, as affirming, that they would be conclusive regardless of all considerations of fraud, if the settlement was not made through mistake or ignorance of a deficiency; for they were instructed, that it would not be conclusive, if the cashier had been guilty of fraud in procuring it to be made. Being thus understood, the plaintiffs surely can have no just reason to complain of it. If there be error in it, the error will be found in its being too favorable to them, by allowing the validity of those acts to be affected by the mere ignorance of the officers of the bank. The next clause, which states in effect, that if the settlement was made with a knowledge on the part of the directors, that there was a deficit in the assets and without fraud on the part of the cashier, it would be valid, may be considered as involving two affirmations; that the directors had competent authority to make it, and that its validity would not be affected by their own fraud only. The part having reference to any fraud, alleged to have been committed by them, will be considered in connexion with the direct affirmance of the same proposition. To deny the authority of the directors of a bank to make a settlement with a cashier, whose accounts exhibit a deficit in the funds, would be to refuse to the bank all right and power to adjust, settle, and relinquish, disputed claims. A right fully existing in every person and corporation capable of transacting business in the usual manner, and necessary to enable them to do it. Such a power is not to be confounded, as it appears to have been in the written argument, with one sometimes assumed by the officers and agents of a corporation, and which has no legal existence, to make donations from, or misappropriate, its funds in violation of the laws and rules regulating its mode of action. This power to settle and relinquish such claims cannot be affected by the amount, which its exercise may enable them to dispose of. The remark, "that it was competent for the directors to allow the cashier such sum, as they pleased, if it were ten thousand dollars," when applied to the facts of the case, only affirmed that they had the power to settle and to relinquish all claim

Frankfort Bank v. Johnson.

to recover from the cashier any deficit exhibited in his accounts, whatever the amount might be; and did not assert, as the written argument insists, that they had the right or power to "give away the property of the company by tens of thousands." For to suppose, that the cashier did not deny, that he was justly chargeable with the amount claimed, is to disregard his positive testimony to the contrary, and to suppose him to be guilty of fraud in the settlement. And if guilty of it, he continued to be liable according to the instructions, although he had made a settlement, and obtained an erasure of the signatures to the bond. The remaining clauses assert, that the fraudulent conduct of the directors in making that settlement would not annul or avoid it, unless the cashier was also guilty of fraud. This is considered in the written argument as a most extraordinary and startling proposition, and at variance with the settled law, as exhibited by the judicial opinions of the highest tribunals. Let the effect of a contrary doctrine upon the practical affairs of life be considered. A person employs an agent, who within the scope of his authority makes a contract with another, and in so doing conducts fraudulently towards his principal, the person with whom he contracts, being entirely innocent and ignorant of the fraud. Is that contract to be annulled and the innocent person to be compelled to suffer loss for the negligence, folly, or misfortune of the principal, who employed the unfaithful agent, and is such a principal to throw the loss upon the innocent, instead of seeking his redress from his own unfaithful agent? Such a question requires no answer; and yet it exhibits the practical result of the doctrine contended for, unless corporate bodies and their directors or agents are to be exempted from the application of the rules of law, which are operative, when applied to individual persons. And why should a corporation, or its stockholders, be permitted to select unfaithful agents or directors, who in the exercise of the powers conferred upon them in making contracts or settlements with innocent persons, commit frauds upon the corporation, and then to claim to be relieved from the effect of those con-

tracts and settlements, and the consequences of their own conduct in the selection of such agents, and to throw their losses or any part of them upon the innocent parties, instead of being required to abide by them, and being left to obtain their redress from their own fraudulent agents? Are corporate bodies to be so favored by the law, as to be held irresponsible for the misconduct of agents of their own selection, while the innocent, with whom they transact business, are to be made to suffer the losses occasioned by it? When judicial tribunals decide these questions in the affirmative, there may be cause for alarm. But they have not so decided. In the case of *Minor* v. *The Mechanic's Bank of Alexandria,* 1 Peters, 71, much relied upon in the argument, the cashier was considered to be aiding the directors to commit the frauds upon the bank, and it is so expressly stated by Mr. Justice Story, who says, "the question then comes to this, whether an act or vote of the board of directors, in violation of their own duties and in fraud of the rights and interest of the stockholders of the bank, could amount to a justification of the cashier, who was *a particeps criminis.*" But if such directors or agents should assume powers not conferred upon them, and while doing so commit frauds upon the corporation, no doubt it would be entitled to relief from any contracts or settlements so made, because it would be the duty of the person contracting or settling with them to make himself acquainted with the extent of their power. While these clauses in the instructions are under consideration, it should be remembered, that they are founded upon the supposition, that the jury should conclude, that the cashier was a perfectly innocent party in making that settlement with the directors, who are to be considered as conducting fraudulently within the scope of their authority; and there can be no doubt, that the law was correctly stated.

There remains one other cause of complaint, that the presiding Judge refused to instruct the jury as requested, " that if any one or more of the directors, who approved the settlement of the 2d Sept. 1840, acted under a mistake in so doing, the remainder of said directors voting would not constitute a legal

majority, and said vote would not be binding upon the plaintiffs." The proposition would seem to amount to this, that a majority of the directors of a corporation, legally authorized to bind it in the transaction of business, is not to be ascertained by computing the number present, but by ascertaining the intelligence, with which they acted; and that if a number of them, sufficient to prevent a majority, are so careless, as not to understand all the facts, which they might, and ought to know to enable them to make a proper contract or settlement, the corporation will not be bound by it, although the other party supposed, that they all were fully informed of every fact. If the law were such as the requested instruction supposes it to be, it would allow a corporation to vacate or annul its own acts and contracts by proof of the carelessness or ignorance of the agents of its own selection, and to make the other party chargeable with the consequences resulting from it. It could not claim to be relieved on the ground of mistake, for relief is granted in such cases only, when the error or mistake was mutual. The doctrine of the requested instruction is inadmissible as a rule of law, and as one might have been assured, it is not sustained by any legal authority.

*The exceptions and motion are overruled.*