FLAMBEAU RIVER LUMBER COMPANY, Plaintiff, vs. CHIPPEWA AND FLAMBEAU IMPROVEMENT COMPANY and another, Defendants. [Cross-appeals.]

*March 14—May 12, 1931.*

For the plaintiff there were briefs by *Quarles, Spence & Quarles* of Milwaukee and *J. W. Carow* of Ladysmith, attorneys, and *J. V. Quarles* of Milwaukee of counsel, and oral argument by *Mr. Arthur Wickham* and *Mr. Arthur B. Doe,* both of Milwaukee, and *Mr. Carow.*

For the defendants there were briefs by *Bundy, Beach & Holland* of Eau Claire and *R. M. Campbell* of Chicago, attorneys for the Chippewa and Flambeau Improvement Company, and the *Attorney General* and *Suel O. Arnold* of Milwaukee, special counsel, attorneys for the defendant Railroad Commission, and oral argument by *Mr. P. M. Beach* and *Mr. Campbell.*

ROSENBERRY, C. J.   Upon the trial the court made and filed exhaustive findings of fact and an opinion discussing

the law applicable to the facts in a helpful way. We do not find it necessary, in order to dispose of the issues presented on this appeal, to set out either the opinion or the findings of fact.[1] The questions presented are (1st) whether the Improvement Company can be held for damages under the facts in this case; (2d) if it be held that the Improvement Company is liable for damages, then whether or not the trial court correctly ascertained the damages for which the plaintiff is entitled to recover; (3d) whether the right of navigation of the Flambeau river for logs and forest products is subject to reasonable regulation under ch. 640 of the Laws of 1911, and if so, whether that part of the judgment which perpetually enjoins the defendant Improvement Company from reducing the flow below 1,300 cubic feet per second, measured at the United States gauging station near Butternut, can be sustained. Such facts as are necessary to present the questions raised for decision will be stated.

The plaintiff has its principal place of business and office in the city of Ladysmith, where for many years it has conducted the business of logging and lumbering, including the cutting of timber and the transportation thereof mainly by water down the Flambeau river to its sawmill located in the city of Ladysmith. Its mill produces 100,000 feet of softwood lumber in ten hours' run. In the winter of 1924–25 the plaintiff cut and banked on the Flambeau river above Babbs Island, ready for the spring drive, 8,790,850 feet of timber. It started its drive on the 3d of April, 1925, at which time the water in the river was very low and continued to fall until log-driving became impracticable. Under the conditions as they existed, the plaintiff was engaged for a period of five weeks in getting its log-drive to the junction with the South Fork of the Flambeau river, and after continuing work on the drive until June 29, 1925, it was

[1] For full statement of facts see margin, *Flambeau River Lumber Co. v. Railroad Comm., ante,* p. 524, 236 N. W. 671.

obliged, for lack of water at Cedar Rapids, a few miles below the junction of the Forks, to abandon the drive. In the winter of 1925–26 plaintiff cut and placed on the ice of the river for driving, above Babbs Island, 3,797,460 feet of logs and started its drive on April 15, 1926. Thereafter the water was lower than in 1925 and continued to drop, and driving progressed with great difficulty. While the water in the South Fork was high, the plaintiff was without a driving stage of water in the North Fork. The failure of the drives in the spring of 1925 and 1926 is claimed by the plaintiff to be due to the wrongful withholding of the water in the North Fork of the Flambeau river. Plaintiff alleges that by reason of such withholding it had been obliged to expend $7,400 in addition to normal expenses in the spring of 1926; that it lost by sinkage of logs in 1925 and 1926 pine logs of the value of $4,536.48 and hemlock logs of the value of $41,909.41; that said sinkage was greatly in excess of the normal sinkage of logs and was mainly due to the fact that the two drives were hung up as a result of the wrongful withholding of water. Upon the advice of counsel, plaintiff did not purchase any timber or attempt to make any log-drive after it had completed the 1926 drive. This action was begun in the autumn of 1927, and except for a brief operation in the summer of 1927 plaintiff has not operated its sawmill since finishing the summer season of 1926. The plaintiff sought to recover loss of profits for the years 1927, 1928, and 1929.

On behalf of the Improvement Company it is argued that under the provisions of ch. 640 of the Laws of 1911 it is a state agent and therefore not liable for wrongs done by it, and to sustain this proposition the Improvement Company relies on *Northern Transp. Co. v. Chicago*, 99 U. S. 635, 25 Lawy. Ed. 336. In that case the city had constructed a cofferdam in the river so as to interfere with the plaintiff's

access to its dock.   A suit was brought to recover for the resulting damage.   The supreme court of the United States said:

"It is undeniable that in making the improvement of which the plaintiffs complain the city was the agent of the state, and performing a public duty imposed upon it by the legislature; and that persons appointed or authorized by law to make or improve a highway are not answerable for consequential damages, if they act within their jurisdiction and with care and skill."

It is hardly necessary to point out the distinction between an act done by a city pursuant to direction of the legislature in the improvement of a highway and the acts of the Improvement Company complained of by the defendant in this case.   The defendant is a corporation organized for profit, and while the rate of return is limited by the terms of the act, the stock in the Improvement Company was to be held by the respective water-power producers in proportion to the capacity of their respective plants and substantial benefits were expected to accrue to the respective owners of these plants by reason of the increased production of electric power in their plants.   The declared purpose of the act was to improve navigation and regulate the flow of the stream.   In order to accomplish this, certain powers were conferred upon the Improvement Company, and in the exercise of those powers it was subject to the order of the Railroad Commission and exercising a power which was public in its nature. It had the right of eminent domain, it had the right to obstruct streams by the erection of dams; but the fact that in doing these things it was exercising a power derived from the state did not render it immune from liability for damages for its wrongful acts committed in the exercise or in excess of its authority.   It was a state agency in the same sense that boom companies, ferries, railroads, and other like

agencies may be said to be state agencies. It was in no sense and to no extent an agency performing a governmental function. It had been granted certain powers possessed by the sovereign for the purpose of carrying out a declared public purpose. A perusal of ch. 640 of the Laws of 1911 makes this perfectly apparent. We shall not indulge in an analysis of the chapter. The most superficial examination of it discloses this fact.

(2d) The question then arises whether or not the plaintiff's damages have been correctly ascertained. Upon this proposition the trial court found as follows:

"The plaintiff sustained heavy losses because of its inability to get its log-drive to its mill in the spring of 1925. Its cost of driving its logs to the point where the same were hung up on Cedar Rapids was largely in excess of the amount it ordinarily would have cost on a good driving stage of water to get its logs to the mill, and by reason of being deprived of the logs for manufacture in the year 1925 and its manufacturing costs on the logs which it received otherwise and manufactured, was largely increased, but none of such losses were chargeable to any wrongful acts of the defendant Improvement Company.

"By reason of the withholding of the water of the river by the defendant Improvement Company in the spring of 1926 the plaintiff was put to additional expenses in its log-driving and was obliged to pay over and above what it would have cost the plaintiff to drive its logs to the mill $7,400. This amount is over and above other extra costs in driving said logs which the plaintiff attributes to wrongful acts of the Lake Superior District Power Company in operating its Big Falls dam.

"The plaintiff lost by sinkage of logs in its said drives of 1925 and 1926 pine logs of the value of $4,536.48 and hemlock logs of the value of $41,909.41. Said sinkage was vastly in excess of the normal sinkage of logs driven to the mill immediately following the season in which they are cut, but was mainly due to the fact that the log-drive started in the year 1925 was hung up and remained in the river until the log-drive of 1926. None of said sinkage was caused by any wrongful acts of the defendant Improvement

Company in impounding the waters of the river in said reservoirs.

"On the advice of counsel the plaintiff did not purchase any timber to cut and float down said river to its mill after completing its log-drive of the year 1926. This was due to the controversy already risen with the defendant Improvement Company over the handling of said reservoirs and because the plaintiff feared to engage in logging and log-driving on said river until its rights could be established or conceded. It did not, however, bring this action until the fall of 1927. Except for brief operation in the summer of 1927 the plaintiff has not operated its sawmill since the finishing of its summer season of 1926.

"During the twelve years preceding the year 1925 the plaintiff in operating its manufacturing and lumber business had averaged to make a substantial profit, in some years making large profits and in some years suffering some losses. The profitable operation of such a business depends upon so many contingencies as to purchases of timber, cost of operation, and state of the lumber market, that the court is unable to find with reasonable certainty that the plaintiff could have made any profit in any of the years succeeding 1926. Upon prompt application in the fall of 1926 plaintiff could have had the protection of the courts in respect to its right of navigation on the river and was not compelled to cease operations because of its controversy with the defendant Improvement Company."

The testimony in the case covers in excess of four hundred pages of the printed case, in addition to which there is a large number of exhibits, tabulations, and computations. To make a reasonably comprehensive statement of the facts would occupy many pages in the report of this case, and so far as we can see it would serve no useful purpose. The question of whether or not the delay of the 1925 drive was due to the operation of the dams by the Improvement Company was a question of fact, it was sharply litigated upon the trial, and a careful examination of the record satisfies us that it cannot be said that the determination of the trial is contrary to the great weight and clear preponderance of the

evidence. The same conclusion is reached in regard to the damages sustained by the plaintiff in the year 1926. The plaintiff claims the damages found are too low, the defendant Improvement Company that they are too high. Manifestly here was a question of fact, the determination of which by the trial court cannot be set aside. Under the facts as stated the right of the plaintiff to recover damages for the years 1927, 1928, and 1929 is a mixed question of law and fact. The trial court was of the opinion that many other factors contributed to the profits of the lumber business and that it cannot be said with reasonable certainty that had the plaintiff operated in those years it would have made any profit. In this conclusion we concur. Such damages are clearly remote, contingent, uncertain, and speculative. If log-driving had been attempted, sufficient water might have been furnished. The loss of profits might have been occasioned by many other factors. A logging, log-driving, lumber-manufacturing and lumber-selling business is subject to many contingencies beside delays in driving logs. Loss of profits in such a business, which are ascertained only by comparison with former years, does not afford a basis for the ascertainment of future profits such as is afforded by an established mercantile business maintained under substantially the same conditions and at the same place where prior profits were earned. This is especially true in view of the fact that the plaintiff had a loss in 1925 of $26,390.63 and in 1926 a loss of $36,100.37. Claim for future damages of $121,500 is based upon the assumption that it could sell 15,000,000 feet of lumber each year at a profit of $2.70 a thousand feet. This claim in the light of ordinary business experience seems fanciful. It is certainly remote, consequential, and speculative.

The trial court made the following finding of fact:

"The majority of the stock of the defendant Chippewa and Flambeau Improvement Company is owned by the

Northern States Power Company, a Wisconsin corporation. The entire outstanding capital stock of said Northern States Power Company, except directors' qualifying shares and 6,203 shares of preferred stock, is owned by the Northern States Securities Corporation, a Delaware corporation. The entire outstanding capital stock of Northern States Securities Corporation is owned by the Northern States Power Company, a Minnesota corporation. The entire outstanding capital stock except directors' qualifying shares of Northern States Power Company, a Minnesota corporation, is owned by the Northern States Power Company, a Delaware corporation. The majority of the stock and voting control of the Northern States Power Company of Delaware is owned by Standard Gas & Electric Company.

"The Byllesby Engineering and Management Corporation is a Delaware corporation, the entire capital stock of which is owned by the Standard Gas & Electric Company. This company manages and operates the plants of the Northern States Power Company of Wisconsin.

"Since the erection of the Flambeau reservoir the reservoirs of the defendant company have been controlled and directed, with the consent of its board of directors, by the general superintendent of the Northern States Power Company of Minnesota, who gives general directions for the discharge from the reservoirs of the company.

"A large portion of the electricity produced by the Northern States Power Company of Wisconsin by the use of the dams in question is exported to the state of Minnesota and sold by the Northern States Power Company of Minnesota.

"The defendant Improvement Company in January, 1926, knew of the failure of the plaintiff to complete its log-drive in the 1925 drive and discussed it at its directors' meeting on January 27, 1926. The accumulation of water stored in the reservoirs in 1926 was made with knowledge on the part of the defendant company of the plaintiff's predicament and the damages which plaintiff would probably sustain as a result of lack of water.

"In the spring of 1926 and ever since the defendant Improvement Company claimed the power and had the intention to withhold each year the flow of the river in order to fill its reservoirs by the spring freshets just when log-driving would

be going on. If that were done, log-driving could not be successfully prosecuted."

On behalf of the plaintiff it is claimed that this arrangement is an evasion of the laws of Wisconsin against a foreign corporation operating a dam in this state; that in order to avoid the force of the statute there was organized a Wisconsin company, namely, the Northern States Power Company, and that company holds a majority of the stock in the Chippewa and Flambeau Improvement Company, which company holds the permit to erect dams; that the Improvement Company is merely an agent of a foreign corporation, and that a foreign corporation directs, dominates, and operates the defendant company. It appears that the dams in question are as a practical matter operated and controlled by an employee of the Northern States Power Company from the offices of the company in Minneapolis. We find no authority in ch. 640 for the delegation of any of the powers conferred upon it by the Railroad Commission to third parties. We are unable to discover what if any authority the Railroad Commission has given to this employee. It appears that the operation of the dams permits of the exercise of discretion within the limits fixed by the order and that this discretion is exercised by the employee for the benefit of the hydraulic power plants. The act provides that the Railroad Commission "shall have supervision and control of the time and extent of the drawing of water from the reservoirs, and the power to compel the maintenance of all reservoirs established."

To enter an order which in the main establishes the rate at which the reservoirs of the Improvement Company may be filled and imposing no duty upon the Improvement Company to discharge the impounded water in aid of navigation and to leave the actual operation and control of the dams to the agents of a foreign corporation engaged in the

production of hydraulic power, is certainly not a compliance with the act. Navigators are entitled to the benefit of the act as a matter of right and not as a matter of favor to be secured from some outside agency. The power of control is vested in the Railroad Commission and it should be exercised by it through its proper agents, who in a situation such as exists upon this river must to a certain extent act in a quasi-judicial capacity, certainly as an arbitrator of conflicting interests. The procedure adopted can only be justified on the theory that the primary purpose was to produce a uniform stream-flow for power purposes regardless of navigation. Control being vested in the Railroad Commission, we are not required in this case to determine whether or not a foreign corporation is holding a franchise in violation of the statute.

In accordance with the holding in *Flambeau River Lumber Co. v. Railroad Comm.*, *supra*, and for the reasons there stated, so much of the findings and judgment as determine the levels, amount of stream-flow necessary for the purpose of navigating the river for the purpose of log-driving, and adjudges that the navigation of the Flambeau river is not subject to reasonable regulation, must be vacated and set aside.

The court found that no order had been entered by the Railroad Commission directing the rate or amount of storage of any water in said reservoirs prior to the time plaintiff sustained the damage for which recovery was sought, except the order of 1915 which fixed the maximum and minimum heads of water at the Rest lake dam.

We are not required to determine whether or not, as against a claim of damages such as that for which plaintiff had recovery under the facts in this case, an order of the Railroad Commission not in compliance with the act would have afforded the Improvement Company any protection. That question does not arise.

614

*By the Court.*—That part of the judgment awarding the plaintiff damages is affirmed. That part of the judgment denying plaintiff damages for the years 1927, 1928, and 1929 is affirmed. So much of the judgment as concerns the navigability and stream-flow is reversed, each party to pay its own costs, the Improvement Company to pay the clerk's fees in this court. The matters covered by the judgment respecting stream-flow, height of reservoirs, etc., will under the judgment in *Flambeau River Lumber Co. v. Railroad Comm.* (*ante,* p. 524, 236 N. W. 671) be re-referred to the Railroad Commission for further proceedings.

FOWLER, J., took no part.