Interior Woodwork Company and others, Respondents, vs. Buhler, imp., Appellant.

*October 13, 1931—February 9, 1932.*

*J. M. Weisman* of Racine, for the appellant; and on her motion for a rehearing there was a brief by *Wilbershide & Baumblatt* of Racine, attorneys.

For the respondents there were briefs by *Paul, Ebert, Paul & Knoeller* of Milwaukee, attorneys, and *Simmons, Walker, Wratten & Sporer* of Racine of counsel, and oral argument by *Harold H. Paul.*

The following opinion was filed November 10, 1931:

FRITZ, J. So far as material, the evidence establishes the following undisputed facts: On March 25, 1927, building

operations were commenced on premises owned by Marie Larsen, under contracts with contractors and materialmen, who furnished the labor and materials, which ultimately resulted in the liens on the premises, which were asserted in this action. On June 8, 1927, Marie Larsen executed a mortgage on those premises to Mary Buhler to secure a loan of $6,000, which was procured under a written agreement negotiated between Marie Larsen and Walter Buhler, a son of Mary Buhler, who acted as her agent. That agreement provided that "the loan of $6,000 is being made on the conditions that the house herein described will be completed and paid for on money now being loaned." Thereafter, at the direction of Marie Larsen, the following payments were made by Walter Buhler, as agent for Mary Buhler, out of the $6,000 loan, to wit: $180 to Mary Buhler's agent as commission for procuring the loan, $529 to discharge a prior mortgage on the premises, and $4,213.65 to contractors and materialmen for work and labor furnished on the premises. After making those payments, $1,077.35 of the $6,000 loan remained in the possession of Mary Buhler's agent on November 2, 1927. At that time the unpaid claims of contractors and materialmen amounted to $5,076.21, and for those claims they were entitled to liens on the property. Those unpaid claims exceeded the balance of the $6,000 loan, which was still in the hands of Mary Buhler's agent, by $3,998.86, and the value of the property as improved was inadequate security for an additional mortgage loan to discharge the unpaid lien claims. With affairs in that state, Marie Larsen applied to Mary Buhler's son for additional financial assistance, which was declined. Thereupon Marie Larsen consulted Sophus Jeppesen, a real-estate broker, who, acting on her behalf, entered into negotiations with William F. Rediske, who was an officer of two corporations which were lien claimants. Those negotiations resulted in a written agreement made on November 2, 1927,

between Marie Larsen and William F. Rediske, which—after recitals as to Marie Larsen's ownership of the premises, Mary Buhler's existing mortgage thereon to secure $6,000, a detailed schedule listing the names of lien claimants and amounts owing them which totaled $5,267.21, and as to the willingness of William F. Rediske to procure a purchaser of all of the lien claims and to incur the expense for attorney's fees necessary in procuring assignments and extensions of the lien claims—provided, among other things, that Marie Larsen agreed to pay to William F. Rediske $1,000 for his services, attorney's fees, and expenses in procuring a purchaser for such claims; that she was also to pay to him $100 monthly, which he was to hold in trust to discharge the lien claims; that she was also to give to William F. Rediske an order on Mary Buhler for $1,077.35, the balance of the $6,000 loan which remained unpaid; and that $1,000 of the $1,077.35 so to be received were to be retained by William F. Rediske for his services, and the balance received was to be used by him in liquidating the lien claims. After the execution of that agreement Marie Larsen executed an order directing Mary Buhler to pay $1,077.35, as the balance of the $6,000 loan, to William F. Rediske. On November 2, 1927, Harold Paul, as attorney for William F. Rediske, presented that order to Walter Buhler as agent of Mary Buhler, and obtained a check for $1,077.35, out of which amount William F. Rediske kept $1,000 for his services and expenses, and held the balance of $77.35 in trust to apply on the lien claims. Thereupon William F. Rediske arranged for the purchase by his brother Herman Rediske of all the lien claims, excepting those of the two corporations, which the Rediske brothers controlled. Marie Larsen paid three monthly instalments of $100, each of which William F. Rediske held in trust to apply on the lien claims. Marie Larsen then defaulted, and finally an action to foreclose the lien claims was commenced. Mary Buhler by cross-complaint sought foreclosure of her $6,000 mortgage, and that

the lien thereof be declared prior to the liens of plaintiffs for labor and materials.

On the trial there was an irreconcilable conflict in the evidence in the following respect: Walter Buhler testified in substance that when Harold Paul obtained the check for $1,077.35, Harold Paul said that he was there to pay off the outstanding bills on the property, and that all accounts would be paid in full, and that the check was to be used for paying the outstanding bills on the property. Walter Buhler also testified that he did not see the contract made on November 2, 1927, between Marie Larsen and William F. Rediske. On the other hand, plaintiffs' witness, Harold Paul, contradicted Buhler's testimony that Paul had said that the money was to be used for paying the outstanding bills on the property; and Paul's testimony was corroborated to some extent by the testimony of Sophus Jeppesen and Walter G. Lange, witnesses called by the plaintiffs and examined by Harold Paul, acting as one of the attorneys for plaintiffs. On the undisputed proposition of whether the $1,077.35 were to be used by William F. Rediske in payment of the lien claims, the trial court found that there was no agreement between the plaintiffs, or any of them, and Marie Larsen or Mary Buhler, to apply any part thereof on anything other than the expenses and commission of William F. Rediske. In view of that finding the trial court concluded that $1,000 of the $1,077.35 should be applied to pay to William F. Rediske such commission and expenses; that the balance of $77.35 should be applied on the lien claims of plaintiffs; and that Mary Buhler's mortgage is subject to the priority of those liens of plaintiffs, excepting that Mary Buhler is entitled to subrogation to the extent of the $529 of her money which was used to discharge the mortgage which was a lien on the premises at the time of the commencement of the construction work. A judgment of foreclosure was entered in accordance with those conclusions. On this appeal it is contended on behalf of Mary

Buhler that the trial court's findings that there was no agreement between plaintiffs and Marie Larsen or Mary Buhler to apply any part of the $1,077.35 upon anything otherwise than services and expenses of William F. Rediske; that Mary Buhler paid the $1,077.35 to William F. Rediske pursuant to Marie Larsen's order; and that the sum of $1,000 was paid to William F. Rediske, leaving a balance of $77.35 to be applied on the plaintiffs' liens, are clearly contrary to the evidence. As is manifest from the foregoing statement, those findings are contrary to the testimony of Walter Buhler, but there is an irreconcilable conflict between his testimony and the testimony on that subject of the witnesses Paul, Jeppesen, and Lange. In that situation it cannot be rightly said that the court's findings are contrary to the great weight and clear preponderance of the evidence. Consequently, as it is not claimed that they are based in any respect upon incompetent or irrelevant evidence, they cannot be set aside on appeal. *Flambeau River Lumber Co. v. Chippewa & F. Imp. Co.* 204 Wis. 602, 236 N. W. 679; *Graham v. Zellers,* 205 Wis. 542, 238 N. W. 385.

On behalf of Mary Buhler it is also contended that as the original written agreement between Marie Larsen and Mary Buhler's agent, pursuant to which the loan was made, provided that the building was to be completed and paid for with the money then being loaned, Marie Larsen could not contract with any other person to dispose of any part of the $6,000 for any other purpose; and hence that the $1,077.35 could not be used excepting to pay the claims for the liens for construction work without the consent of the mortgagee. Her counsel argues that the agreement between Mary Buhler's agent and Marie Larsen that the loan was on condition that the house would be completed and paid for on the money loaned, was for the benefit of third par-

ties, viz. the contractors and materialmen, as well as for the benefit of Marie Larsen and Mary Buhler, and consequently the $1,077.35 could not be used otherwise without the consent of the mortgagee and the lien claimants. The answer to that contention is that although the contract binds and concludes Marie Larsen as one of the parties to it, it does not conclude William F. Rediske or any of the lien claimants. None of them was ever a party to it, and it does not appear that they ever had any knowledge of or sought to benefit by its provision for the disposition or use of the $6,000 loan. On November 2, 1927, neither of the Rediskes nor any of the lien claimants were under any obligation to Mary Buhler or to Marie Larsen by reason of the agreement signed by Marie Larsen in order to procure the loan. So far as the Rediskes or the lien claimants were concerned, there existed no obligation on their part in favor of Mary Buhler or Marie Larsen which was violated or impaired in any respect by William F. Rediske when he entered into the contract of November 2, 1927, with Marie Larsen and obtained from her the order for the payment of the $1,077.35, of which he was authorized by her to retain $1,000 for his services, etc.

It is further contended that Mary Buhler, as mortgagee, and the lien claimants were all engaged in a common enter-. prise; that, by reason of the partial payments on account, which the lien claimants had, at the direction of Marie Larsen, received from Mary Buhler's agent, who used part of the $6,000 loan for that purpose, the lien claimants had notice that their claims were to be paid out of a loan for construction purposes procured by Marie Larsen from the mortgagee; and that, therefore, in equity the mortgagee and the lien claimants should participate *pro rata* in the proceeds of the property on a foreclosure sale. Although such a distribution might be more equitable as far as the mortgagee

is concerned, it would be in utter disregard of the right of a lien claimant as fixed by the provision in sec. 289.01, Stats.; that—

"Such lien shall be prior to any other lien which originates subsequent to the commencement of the construction, repairs, removal or work aforesaid of or upon such dwelling house; . . . shall also be prior to any unrecorded mortgage given before the commencement of such construction, repairs, removal or work, of which mortgage the person claiming the lien has no notice."

That statute was considered and applied in *Wisconsin P. M. Co. v. Schuda,* 72 Wis. 277, 283, 39 N. W. 558; *Evans-Lee Co. v. Hoton,* 190 Wis. 207, 208 N. W. 872; *Prince v. C. G. Bretting Mfg. Co.* 203 Wis. 504, 234 N. W. 699. Under that statute and those decisions the liens of the plaintiffs for services and materials dated from commencement of the first work on March 25, 1927, and by the very words of the statute those liens are prior to any other lien which originates subsequent to the commencement of construction. As Mary Buhler's mortgage did not originate until it was executed on June 8, 1927, it was by virtue of that statute subordinate to those liens, regardless of the purpose for which the proceeds of the mortgage were to be used.

In the case of *Wisconsin P. M. Co. v. Schuda, supra,* the proceeds of a mortgage loan were also to be used for the purpose of paying for the construction of a building. Nevertheless it was held that if the work of construction was commenced prior to the execution of the mortgage, the liens for such work and materials were prior to the mortgage.

The conclusion reached in *Ward v. Yarnelle,* 173 Ind. 535, 91 N. E. 7, is contrary to the established legislative policy of this state as evidenced by the provisions of sec. 289.01 and other provisions in ch. 289, Stats., and as recognized by the decisions of this court.

It follows that the judgment must be affirmed. However, we must again condemn the impropriety of an attorney, who knows in advance of a trial that he is a necessary and material witness, and that he will be required to testify to contested facts, also attending and participating in the trial as an attorney for one of the contesting litigants. Harold Paul was the first witness called on behalf of plaintiffs, and then, and again on rebuttal, he testified to the most important contested matters on which plaintiffs relied. Nevertheless, he also, as attorney for plaintiffs, conducted all direct and cross-examinations of all other witnesses, and apparently participated in all arguments on the trial as well as in this court. His dual capacity in this litigation is clearly within the condemnation expressed in *Roys v. First Nat. Bank,* 183 Wis. 10, 20, 197 N. W. 237; *Zeidler v. State,* 189 Wis. 44, 48, 206 N. W. 872; *Borger v. McKeith,* 198 Wis. 315, 319, 224 N. W. 102; *Baumgartner v. State,* 198 Wis. 180, 186, 223 N. W. 419, 224 N. W. 474. The last two cases recognize that unanticipated situations may develop during the course of a trial because of which the interests of justice may demand that an attorney take the stand, but that, manifestly, did not occur in the case at bar. As stated in the cases cited, the practice offends against rule 19 of the Canons of Ethics of the American Bar Association, which states ethical considerations that must appeal to every lawyer as sound. Because of those considerations, under such circumstances as existed in the case at bar, an attorney should voluntarily retire from the conduct of litigation as soon as the incompatibility in roles becomes apparent, or else his client should forego having him testify as a witness in support of his client's cause.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on February 9, 1932.