WESTERN INDUSTRIES, INC., Appellant, vs. VILTER MANU-
FACTURING COMPANY, Respondent.*

*May 1—June 30, 1950.*

---

\* Motion for rehearing denied, with $25 costs, on October 3, 1950.

FRITZ, C. J., and HUGHES and BROADFOOT, JJ., dissent.

274

For the appellant there were briefs by *Gold & McCann* of Milwaukee, and *Wilkie, Toebaas, Hart, Kraege & Jackman* of Madison, and oral argument by *Oscar T. Toebaas* and *Ray T. McCann*.

For the respondent there was a brief by *Sullivan & Nelson* of Milwaukee, and oral argument by *Willis G. Sullivan* and *Reginald W. Nelson*.

FAIRCHILD, J.    The owners of the stock in a corporation, while engaged in lawful acts which affect the corporation, may commit the corporation to certain obligations, assuming that the rights of the creditors are properly respected. *Hamilton v. Menominee Falls Quarry Co.* 106 Wis. 352, 81 N. W. 876; *Hoberg v. John Hoberg Co.* 170 Wis. 50,

173 N. W. 639; *Jesse v. Four Wheel Drive Auto Co.*
177 Wis. 627, 189 N. W. 276; *Davies v. Meisenheimer,*
254 Wis. 419, 37 N. W. (2d) 93. The rule as read out of
the cases is expressed in 3 Thompson, Corporations (3d
ed.), p. 989, sec. 2301:

"Undoubtedly a private corporation may . . . even with-
out consideration . . . give away its assets, or mortgage its
property for the benefit of individual stockholders or officers,
where all the stockholders assent to any such transaction,
and where there are no corporate creditors and there is no
statute expressly forbidding such transaction." See also 5
Fletcher, Cyc. Corp. (perm. ed.), p. 347, sec. 2099; 1 Cook,
Corporations (8th ed.), p. 15, sec. 3.

The circumstances under which the transaction occurs will
determine the propriety of the acts and establish the binding
effect thereof upon the corporate entity, when an all-inclusive
stockholder interest has given its approval.

The Vilter Manufacturing Company was, prior to the
important dates here involved, a "close corporation." The
stock in that corporation was owned and controlled by mem-
bers of the Vilter family, either individually or in trust.
Prior to April, 1945, the owners, for reasons appealing to
them, had considered selling their interest. They were the
owners of the common and preferred stock. During the pe-
riod here in question the defendant was engaged in the pro-
duction of heavy armament for the armed services. It had
been engaged in the manufacture of ice machines and refrig-
eration equipment. In January, 1942, Earl B. Tilton was
employed to act as executive vice-president and general man-
ager to take effect November 1, 1943, and it appears that he
was, under the control of the directors, to have final execu-
tive authority in respect to business policies, and the contract
was to continue until October 31, 1947. We quote from the
statement of facts in respondent's brief that, "At the incep-

tion of the transactions hereinafter discussed, all of defendant's outstanding common and preferred stock was owned by the members of the Vilter family, either directly or in trust. Commencing in 1943, the stockholders conducted a series of negotiations for the sale of their stock, but none of these negotiations reached fruition because of the inability of the stockholders to decide on the price they were willing to take. These negotiations, however, precipitated rumors which had an adverse effect upon defendant's business, and Tilton finally called the stockholders together and told them that they were ruining the business; that they should decide among themselves whether they wanted to sell; and if they decided to sell, they should agree upon the price which they would take, and if this price were not forthcoming within a limited time they should abandon their efforts to sell. As a result of his urging, on March 9, 1945, all the stockholders, with one exception, entered into an agreement to sell their stock at a stipulated price provided the sale could be concluded not later than April 30th." The issues lead into many incidental transactions resulting in a long trial. Some were thoroughly explained, but much of the testimony in relation thereto is not necessary to a review here. We are concerned directly with whether the defendant by reason of being the responsible party to a contract, through acts of its agent or by ratification, has assumed it. Our decision will therefore be the result of application of the law to the facts material and relevant to those questions.

In following out the suggestions made by Mr. Tilton, an agreement providing for disposition of the assets of the corporation and for the payment of a broker's fee was drawn. It reads:

In consideration of one dollar ($1) and other valuable consideration in hand paid by each of the undersigned to the

others, the receipt whereof is hereby acknowledged, each of the undersigned agrees as follows:

1. To sell or otherwise dispose of his or her interest in the preferred and common stock of the Vilter Manufacturing Company (hereinafter called the "company") for a consideration measured by a proportionate share of one million two hundred thousand dollars ($1,200,000) for all of the preferred and common stock of the company. It is understood that the acquisition price or consideration may consist of nine hundred thousand dollars ($900,000) in cash *and a mortgage upon the real and fixed properties of the company in the amount of three hundred thousand dollars ($300,000)* securing notes payable in instalments of thirty thousand dollars ($30,000) every six months, with final maturity at the end of five years, the unpaid balance from time to time to bear interest at four per cent (4%) per annum, payable semi-annually. The form of the mortgage shall be such as is approved by the holders of a majority of the common and preferred stock of the company prior to disposition as herein provided.

2. Each of the undersigned authorizes the payment of a broker's commission of five per cent (5%) on one million two hundred thousand dollars ($1,200,000) out of the proceeds received for the stock of the company.

3. In case the undersigned is a beneficiary of an estate or trust holding common and/or preferred stock in the company the undersigned will use his or her best efforts to cause such estate or trust to join in any disposition of stock hereunder upon the terms hereinabove indicated.

4. It is understood that reference herein to disposition of the stock of the company shall include acquisition thereof by the company or sale of the assets of the company for a price which will net to the stockholders the same amount as would be the case if the stock were sold as herein described. No stockholder shall be obligated hereunder to sell or otherwise dispose of less than all of his stock in the company.

5. This agreement shall continue in force until April 30, 1945, and shall be enforceable by any one of the undersigned who produces a purchaser or purchasers or develops or de-

sires to proceed with a plan which will comply with the terms hereof.

6. This agreement may be executed in any number of counterparts and all of such counterparts shall constitute but one instrument.

Dated March 9th, 1945.

First Wisconsin Trust Co.        John Narilyn Goes
   By W. I. Barth, Vice-President   By        Trustee
Fred D. Trubshaw              Diana G. Markham
Trustees for Theo. Vilter, dead   By        Agent.
Fred C. Trubshaw
W. I. Barth
Waldimer R. Kramer
Ernest F. Vilter
William B. Vilter
Elfrieda B. Vilter

From the beginning of this matter and consistently through all the negotiations leading up to the controversy between the plaintiff and defendant the Vilter Manufacturing Company was involved by the action of its owners, and we are to determine on this appeal whether or not the plaintiff, under the circumstances, is to have the benefit of the agreement described in its complaint appearing in the statement of facts. The plaintiff's right exists if it appears that a contractual relation was created between the plaintiff and defendant by reason of plaintiff's dealings with the attorneys for Vilter, including Mr. Foley and Mr. Rapkin, whose firm represented the original owners of the stock in the Vilter Company and who for some time had been attorneys for the Vilter Company. The plaintiff was not an intermeddler or a volunteer. Its services were solicited by the attorneys who had been commissioned to accomplish a desired result. In view of the terms of the stockholders' agreement, it is considered that the attorneys representing the defendant's interests then involved were acting within the aforesaid scope of their authority. They solicited the services of plaintiff. In compliance with their request the plaintiff produced a purchaser whose offer met the requirements of defendant and at the same

time provided for a fee to plaintiff to be paid by the customer. Had that plan been followed, plaintiff's fee of $30,000 in addition to the purchase price of $1,300,000 would have been paid. As we have suggested, there is also the point that, in addition to this contractual relation, the obligations arising out of that agreement were in any event assumed eventually by the defendant because of its ratification of the acts of those representing it.

With respect to the facts which show a contractual relation between the plaintiff and the defendant with reference to the amount sought to be recovered in this action, the defendant now insists that it is not indebted by reason of anything which has occurred. It is urged in its behalf as the reasons for there being no liability that prior to May 1st, when Foundation, Inc., came into existence, there actually had been no hiring of the plaintiff to render any service for which the defendant is responsible. This contention is based upon the proposition that Mr. Rapkin had no authority, either actual or apparent, to hire the plaintiff under any circumstances which can in any way involve the defendant. The solution of the problem then requires a determination from the testimony of all concerned of the effect of the relation of the firm of attorneys, of which Rapkin was a representative, to the defendant at the time the arrangement with the plaintiff was made and its authority under the agreement between the stockholders in the effort to find a buyer of Vilter Manufacturing Company. The trial court in his opinion said: "In the court's opinion, if he [Boheim] has a claim for services of any kind against any of the persons connected with Vilter, it may be against the original stockholders, but certainly not against the Vilter Manufacturing Company." The trial court was of the opinion that the transaction so far as plaintiff is concerned should be held to be against public policy. This only brings to the fore the questions as to whether a legal obligation to pay a broker's fee to plaintiff was created in con-

nection with the matter, and whether that obligation was assumed by the defendant, for certainly if such a contract was made it is not against public policy. 12 Am. Jur., Contracts, p. 666, sec. 169. A broker's fee was among the expenses provided for by the stockholders' agreement set out above. The amount in plaintiff's claim is larger than that referred to in the agreement. Other services and accommodations were granted. The fact that a larger amount was fixed upon does not control the plaintiff's rights. The validity of a contract does not necessarily depend upon the weight of the balance between the amount going to one of the parties in exchange for what the other party received. If fairly made, disproportion in those respects is of little concern, and in the absence of fraud or overreaching by deception or other unlawful means, the contract remains good. 7 Am. Jur., Bills and Notes, p. 927, sec. 234.

From a study of the testimony, which extends over many pages, we are of the opinion that the evidence tends to show that the defendant is responsible to plaintiff under the terms of the agreement, and also that there was a valid assumption through ratification of the obligations of that contract. The stock in Vilter Manufacturing Company was, in fact, completely the property of the Vilter family, the members of which signed the agreement set out above. These stockholders, as we have said, finally reached a time when they determined to sell. They decided, on the advice of Mr. Tilton, to secure if possible within a given time certain results in the payment to them of what they considered the value of their holdings. They instructed their lawyers, Miller, Mack & Fairchild, of which firm Mr. Leon Foley was a member and Mr. Rapkin an associate, to proceed in accomplishing for the Vilter owners their desired results. The work was undertaken, and as a charter for the plan under which they were to proceed the agreement already referred to was drawn. Different proposals were considered. It is evident that the

first idea was to sell the property to someone willing to buy. As will appear from what may be said later, another plan for securing a satisfactory result was considered. During the consideration of plans the plaintiff, by its representative, Mr. Boheim, who is the practical owner of the plaintiff and operated for it, was brought into the matter by Mr. Rapkin. As the conferences with plaintiff's representative continued, different steps were taken, and at first the plaintiff, through Mr. Boheim, was to secure a purchaser. Different concerns had manifested an interest in buying. One group, referred to in the evidence as the Coon group, had a plan to buy the assets, but there was never any definite offer in any way accepted, and nothing came out of this proposal. Another group known as the Aerodynamics group became interested in negotiating on the basis of the price fixed, but was dropped as a buyer for sufficient reasons. Finally, the plaintiff was called in, and through its efforts a group described as the Abbell group made a written offer accompanied by a $50,000 deposit to buy on terms within, and as to amount better than, those stipulated in the agreement set forth above. As we have said, by the production of this purchaser, had that sale been made, the plaintiff would have been entitled to his share of a finder's fee in the sum of $30,000, to be paid by the purchaser.

The plan of creating a charitable organization which would take over the common stock of the Vilter Company and call the preferred stock at a sum which would give to the Vilter stockholders the amount of money they desired was then studied. However, the representatives of the stockholders and of Vilter Manufacturing Company did not immediately decide to reject the Abbell offer which the plaintiff had produced. And to keep the plaintiff interested and to hold the prospect of the Abbell purchase, Mr. Rapkin, representing his firm, under the circumstances agreed to pay the plaintiff the sum which it considered it had earned by producing a pur-

chaser for the property. Mr. Rapkin frankly stated that he did ask the plaintiff's representative to keep the Abbell offer open until it was certain there would be no failure to find an outlet through the plan of creating the charitable organization and having it take over the stock of Vilter Manufacturing Company, and to continue to give the benefit of his familiarity with financing and organization to defendant. Due consideration was given to the fact that plaintiff, under the circumstances, was in a position where it might in good faith claim to have earned its broker's commission or fee. It was with those conditions in mind, including Mr. Boheim's continued assistance, that Mr. Rapkin concluded he was warranted as a representative of the stockholders and of the Vilter Manufacturing Company in agreeing to pay the plaintiff an amount equal to that fee. This was agreed to, and the matter proceeded from one development to another, clearly with the expectation on plaintiff's part that it would be paid the amount, including consideration for further services, agreed upon as a compromise between the claim for the finder's fee and the adjustment on the part of the defendant through its attorneys. The representative of the plaintiff agreed to assist in every way he could the working out of the "transition" from the Vilter stockholders to the charitable foundation which was to become the owner of the common stock.

This acquiring company, the Foundation, was lawfully organized under the name of "Foundation for Wisconsin Charities." It became a legal corporate entity. There was neither violation of law nor transgressing of public policy in the creation. Mr. Foley, Mr. Drechsler, Mr. Hendricks, and Mr. Rapkin, as incorporators, had charge of Foundation's affairs. The business or enterprise of the defendant thus coming under the control of the new corporation continued in a direct line as the Vilter Manufacturing Company. It continued under these plans and negotiations for maintaining its existence, with the plaintiff assisting in the efforts of the at-

torneys to bring about a result which was desired by the owners of the Vilter Manufacturing Company and consistently with the agreement made between themselves as set forth in this opinion.

The contention of the respondent is, and the decision below in its favor holds, that Vilter Manufacturing Company is not responsible in any way for the contract made by the firm represented by Mr. Rapkin. However, the findings of fact on which that conclusion is based are against the great weight and clear preponderance of the evidence, for, as appears from the evidence, the defendant, an existing corporate entity, did, by act of those lawfully empowered to negotiate for it, assume and undertake to protect the plaintiff against the loss which would have resulted to it by reason of rejecting the offer to purchase which it procured and for services rendered. This appears clearly from the proceedings disclosed by excerpts from the minutes which follow:

Waiver of Notice and Consent to Holding of Special
Meeting of Board of Directors of Vilter, on
May 1, 1945.

"We, . . . the board of directors in the Vilter Manufacturing Company, a Wisconsin corporation, do hereby . . . consent to the holding of a special meeting of the board of directors . . . for the purpose of considering and taking action with respect to the following: . . .

"5. The incurring of obligations for and assumption of all expenses that may be incident or involved in connection with carrying out any of the matters determined upon at said meeting."

Minutes of a Special Meeting of Board of Directors of
the Vilter Manufacturing Company, held
May 1, 1945.

"Be it further resolved, that the company's president or a vice-president and its secretary or any of them be and they hereby are authorized and directed to take all steps and do all things which in their judgment may appear necessary in order to carry out the terms and provisions of the foregoing resolutions." [Acceptance of resignations of old officers and

election of new officers; redemption and cancellation of preferred stock.]

Minutes of Special Meeting of Board of Directors of the
Vilter Manufacturing Company, on May 8, 1945.

"Detailed report was further made concerning action taken by the officers in carrying out all resolutions adopted by the stockholders and by the directors at their respective meetings of May 1, 1945, which resolutions appear in the respective minutes of said meetings. . . .

"Mr. Rapkin particularly indicated the action taken by the officers in carrying out the loan agreement of May 1, 1945, with Commercial Discount Corporation and detailed the manner in which the company's receipts and assignment of accounts receivable were being handled. In the course of this explanation he reported that a statement, dated April 30, 1945, addressed to the company, had been delivered to him by Western Industries, Inc., in the sum of $30,000. The statement was for services previously rendered to the company and in an amount agreed upon by Mr. Foley as president and Mr. Rapkin as vice-president, with the board's approval. Mr. Rapkin stated that he believed that payment of the amount of this statement could be arranged for over a period of time. . . .

"Resolved that all action of the company's officers with respect to any and all matters reported at this meeting and with respect to any resolutions adopted by and matters reported to the stockholders and the directors of the corporation at their respective meetings of May 1, 1945, be and the same are hereby approved, ratified, and confirmed in all respects."

Minutes of Special Meeting of Stockholders of Vilter
Manufacturing Company, held May 16, 1945.

". . . resolved that all action determined upon or taken by the board of directors at its meetings of May 1, 1945, and May 8, 1945, as revealed by the minutes of said meetings and all action taken by the officers of the company with respect or pursuant to any of the resolutions adopted by and matters reported to the stockholders or the directors or both at their respective meetings held May 1, 1945, and May 8, 1945, should be and the same were ratified, confirmed, and approved in all respects."

Minutes of Special Meeting of Board of Directors of the
Vilter Manufacturing Company, held May 16, 1945.

"The secretary read the minutes of the special meeting of
the board of directors held on May 8, 1945, . . . the minutes
were unanimously approved as read. . . .

"Resolved that all action of the company's officers with
respect to any and all matters reported at this meeting and
with respect to any resolutions adopted by and matters re-
ported to the directors of the corporation at their meeting of
May 8, 1945, be and the same are hereby approved, ratified,
and confirmed in all respects.

Minutes of Special Meeting of Board of Directors of the
Vilter Manufacturing Company, held May 23, 1945.

"The secretary read the minutes of the special meeting of
the board held on May 16, 1945, . . . the minutes were ap-
proved as read and all action taken thereat confirmed and
approved."

Minutes of Special Meeting of the Members of Vilter
Manufacturing Company, held May 28, 1945.

"The secretary read the minutes of the special meeting of
the stockholders held on May 16, 1945, and the minutes were
unanimously approved as read.

"The secretary then read the minutes of the meetings of
the board of directors held on May 16 and May 23, 1945,
respectively, and, . . . all action taken at said meetings by
the directors and all action of the company's officers taken
pursuant to any resolutions adopted at said meetings by said
board of directors or reported to said board were ratified,
approved, and confirmed in all respects."

The learned trial judge, in an effort to confine the issues
to those essential to a determination of the real controversy
between the plaintiff and the defendant, excluded some testi-
mony which would have had a tendency to show more fully
the amount of the additional services rendered by plaintiff
during what is styled in the evidence as the "transition pe-
riod." We do not consider the ruling there of a prejudicial
nature, for it is unnecessary in this case to determine to a

nicety the exact adequacy of the work performed in its relation to the amount to be paid in order to establish a consideration for the agreement. Evidence shows that plaintiff was in a position to assume that he had earned $30,000 when the shift from an outside sale to placing the matter under the control of a charitable organization was made. *Sargent v. Palace Cafe Co.* 175 Cal. 737, 167 Pac. 146; *National Bank v. Pingree,* 62 Utah, 259, 218 Pac. 552; *MacQueen v. Bank,* 133 Ohio St. 579, 15 N. E. (2d) 529.

In 1 Williston, Contracts (1st ed.), p. 294, sec. 134, that author says:

"Somewhat analogous to consideration void in part is the case of a promise based partly on moral obligation or motive of generosity, as where a sum is promised in return for past as well as present consideration; or partly in return for services and, confessedly, partly as a gift. If one undivided sum is thus promised, the promise is supported by valid consideration." See Restatement, 1 Contracts, p. 438, sec. 295.

The nature of the services rendered by brokers entitling them to their fees is well understood, and while the time actually consumed in finding a purchaser might not be great, under the general practice in those instances, it is not unusual for the amount of the fee to be determined on the basis of the amount involved, ability to find a market and to conclude a transaction. Here upwards of $1,300,000 was being dealt with under circumstances which included the plan of keeping the business going and paying to the owners of the stock that amount of money. The decision on this appeal does not rest, as we say, upon the rulings as to that particular evidence or that phase of the case. A valid contract between competent parties was made. The conclusion that plaintiff is entitled to judgment is fortified also by a valid ratification of the contract by a lawfully organized and existing board of directors representing the defendant. Their acts are sufficient to

impose upon the defendant in that respect the liability claimed by the plaintiff.

The differences which seem to have arisen and prompted those presently in control of Vilter Manufacturing Company to challenge this claim are not of determining importance in this litigation. Factions may have developed, and more consideration might have been shown by one to another. The suggestion that for a time Mr. Tilton's rights were being interfered with and he was likely to be placed at a disadvantage if certain events occurred does not weigh here. The fact that Mr. Tilton was kept in ignorance of what was going on during these negotiations is not of significance now, except as it may show the background of discord. Mr. Tilton objected when he did learn of the matter. He did not want the officers of the Foundation to attempt to run the Vilter Manufacturing Company "from a law office uptown." He protested that the plaintiff's claim was unjust, and that due regard had not been given by the officers of the Foundation to their fiduciary relation to the matters in hand. There is evidence that he thought the claim would not exceed in value $6,000.

The trial court's expression indicated belief on its part that when the Vilter stockholders decided to organize a charitable corporation to own Vilter, that that charity immediately became vested with superior rights to all Vilter assets and the new owners of Vilter had become trustees of the assets for the benefit of the charity, so that any action taken which was improvident from the charity's point of view was a breach of trust and could be repudiated when control came into the hands of new trustees. This again overlooks an important element. The original owners of Vilter had the right to keep for themselves the proceeds of their stock when liquidating their holdings. If such were not the rule and one to the contrary could be invoked here, it would permit a court to determine how much of Vilter's value its original owners

could keep out of their holdings without being accused of unlawfully taking it from their donee. It would result in a requirement to disgorge such part of the proceeds of their stock as the court might think equitable. It would take away from them the rights which they have of ownership over their own property. There has been no action at law by those now controlling the defendant against the former representatives, if occasion ever did exist for beginning one. No effort by means of *quo warranto* under the facts disclosed would seem to be warranted. The defendant retains the avails of the transaction.

The stockholders were prompted by a desire to conserve their interests. Some of the actions taken were decidedly for the benefit of the stockholders, but in this connection it must be borne in mind that they were the owners of all the stock and it was their interest that was being served, although the Vilter Manufacturing Company was involved and controlled by these actions. The Vilter Manufacturing Company's existence was preserved, either through the wisdom of the planners or by good fortune. Mr. Tilton is now in a position of importance. The Foundation was organized. It was later abandoned, but in the meantime the original stockholders turned over their common stock and gave up the control to the officers of the Foundation. Its officers became the responsible governing body for a time.

Sec. 180.15, Stats., provides: "Stock held by one corporation in another shall be voted by the president of the former, unless its board of directors, by resolution, designate some other person for that purpose; and the officers of the former corporation may be chosen, qualify and act as directors and officers of the latter corporation."

There were other developments with relation to the corporate nature of the defendant, but it never parted with or lost its character as a corporation engaged in business. The Foundation became dormant, but the defendant at all times acted

in its own interest as directed, first, by the stockholders, and later by succeeding directorates.

The contention that defendant's stockholders, its agents, its officers, and directors, as one set succeeded another, had no authority to promise that the defendant would pay plaintiff, or to ratify that promise, and that the action is for "$30,000 finder's fee in masquerade" does not take into consideration all the facts and circumstances; and any findings of fact that can be so construed are against the great weight and clear preponderance of the evidence. The contract set out at the beginning of this opinion shows the authority which the then owners gave to their agents, and this is sufficient to bring it under the rule of such cases as *Johnson v. Associated Seed Growers, Inc.,* 240 Wis. 278, 283, 3 N. W. (2d) 332, where the doctrine is recognized that "the creation of an agency carries with it the usual and appropriate means of accomplishing its objects and clothes the agent with such authority as is proper and necessary to effectuate its purposes." *Voell v. Klein,* 184 Wis. 620, 200 N. W. 364. This is not a case where the apparent authority is established by acts of the agent. The contract speaks for itself. Other points raised require no discussion.

*By the Court.*—Judgment reversed and cause remanded with directions to grant judgment in plaintiff's favor.

Fritz, C. J. (*dissenting*). The evidence on the trial established without dispute that on and prior to March 9, 1945, the defendant corporation, the Vilter Manufacturing Company (hereinafter referred to as "Vilter Company"), was profitably engaged in manufacturing refrigeration equipment, and also heavy armament for the government during the war. Most of the shares of its stock were owned by the Vilter family. At the times of the transactions involved in this action Earl B. Tilton was the treasurer, executive vice-president, and general manager of Vilter Company, and given "final executive authority" in respect to its business policies,

administration, organization, etc., and the "co-ordination of all operating and financial matters," and by the terms of a contract his employment was to continue until October 31, 1947. The holders of the common and preferred stock of Vilter Company desired to sell either their stock, or the corporation's assets; and on March 9, 1945, they (with one exception) entered into a contract (quoted in the opinion of the court) to sell their stock for the price stipulated in that contract. It was prepared by a law partnership, Miller, Mack & Fairchild (hereinafter called the "Miller firm"), which the stockholders selected to attend to the sale of their shares of stock in accordance with that contract. But Vilter Company was not a party to that contract or any negotiations thereunder, and it did not take any corporate action authorizing anyone to sell its assets or shares of its stock.

The evidence on the trial admitted of the court's findings to the following effect: On April 2, 1945, Joseph E. Rapkin, one of the associates of the Miller firm, upon being called into a meeting of the Vilter Company stockholders, learned that their shares of stock were for sale, and that negotiations with one of two prospective purchasers were being conducted on the basis of a price of $1,300,000 net to the stockholders. With their permission Rapkin asked his close personal friend and client, Otto A. Boheim, if he was interested in buying the stock at $1,300,000 net to the stockholders. Boheim declined to make a bid, but asked and received Rapkin's permission to try to find a purchaser at said price, with a finder's fee or commission to be paid by purchaser. Boheim and his wife and daughter owned and were officers of Western Industries, Inc., the plaintiff in this action. On April 27, 1945, Rapkin and three associates of the Miller firm organized a nonstock, nonprofit charitable and scientific corporation (which after an amendment was called "Foundation, Inc."), for the purpose of purchasing from the Vilter Company

stockholders all of their shares of stock at the price of $1,300,000. Foundation, Inc., had no capital or assets and it was organized with the intention of using the liquid assets of Vilter Company, and additional funds which were to be obtained on a loan secured by its other assets, to pay to its stockholders the price of $1,300,000 for their shares of its capital stock; and Rapkin and said three associates were elected as directors and officers of Foundation, Inc.

On April 28, 1945, a written offer of $1,300,000 for the Vilter Company shares of stock was made by Maxwell Abbell, and concurrently therewith the offerer agreed that if his offer was accepted he would pay a commission or finder's fee of $60,000, of which the plaintiff in this action agreed to pay $30,000 to other brokers, leaving $30,000 for plaintiff. On April 30, 1945, Maxwell Abbell's offer was rejected by the Vilter Company stockholders; and on May 1, 1945, an offer of $1,300,000 for their shares of stock was made by Foundation, Inc., and it was accepted; and the sale consummated by the stockholders transferring the shares of stock to Foundation, Inc., for $1,300,000. On May 1, 1945, the directors and officers of the Vilter Company, excepting Earl B. Tilton, resigned, and said four associates of the Miller firm were elected directors of Vilter Company, and Rapkin became a vice-president.

Upon Boheim learning on April 30, 1945, that the Maxwell Abbell offer had been rejected and that a finder's fee would not be paid to him, he told Rapkin, "Joe, as far as we are concerned our work is finished and we will present *you* a bill for $30,000." That bill reads: "Apr. 30, 1945, Vilter Manufacturing Co., Milwaukee, Wis. Terms: 10 days net. For services in connection with your financing, $30,000." In relation to that bill and proceedings in respect thereto on May 1, 1945, by said newly elected board of directors, Rapkin testified:

" . . . that would have been the amount he [Boheim] would have received on the other deal and I felt that it was fair in the light of the services which he had rendered, and the fact that he would be so valuable to us in this transition period, that we should be willing to pay him the $30,000, that he should suffer no loss. There wasn't any objection. . . . . I think, except for whatever explanation I made on May 1, that we, I never tried to elaborate on the nature of the service after that.

"Q. At that meeting of May 1, what consideration and influence did you and the other directors give to the fact that Mr. Boheim had this contract to get a $30,000 finder's fee, if the Chicago deal went through? A. I think it was given some consideration.

"Q. And it influenced your judgment in approving the bill? A. Yes."

Boheim, in testifying, admitted that until he told Rapkin on April 30, 1945, "we will present you with a bill for $30,000," Rapkin had never told him that he was employing him to render any services for Vilter Company; that prior to May 1st Rapkin had nothing to do with the stockholders or directors of Vilter Company, and that he never discussed business matters with any of its officers. Boheim claims that he was "hired" by Rapkin for defendant, but neither Rapkin nor Boheim testified as to any such hiring of Boheim; and he never asked Rapkin whom he was representing, and Rapkin did not say. He had not been given any authority by the officers, directors, or stockholders of Vilter Company to hire Boheim on behalf of defendant for any purpose; and upon Rapkin's inquiry he was informed only that Boheim could try to find a purchaser on the condition that a finder's fee be paid by such purchaser. Rapkin testified also that before May 1, 1945, he did not discuss any management problems with Boheim and had no authority to hire him for any purpose on behalf of Vilter Company; and there had been no previous discussion between Boheim and Rapkin in relation to any compensation to Boheim from anybody, excepting

Boheim's statement as to a finder's fee to be paid by a purchaser.

Rapkin did testify that he "called on Boheim for advice and assistance on working out the financing," but Rapkin also testified that he alone arranged the financing for Vilter Company to obtain a required loan with Commercial Discount Corporation; and that Boheim did not help to get that money. Likewise Boheim testified that he did not participate in the transactions with the finance company; that he did not have anything to do with the real-estate mortgage, because the loan of the money was entirely up to the Miller firm and the stockholders and directors of the corporation; that Rapkin "did not come to us for advice as to how to set it up; and we did not give him any advice, as to how to set it up, because we do not know enough about those charitable organizations." And also Rapkin testified that Boheim did not consult "with us so far as Foundation, Inc., is concerned. . . . He didn't work on the consummation of the transaction."

There is, however, some testimony that on May 1, 1945, without the consent or approval of Earl B. Tilton, the executive vice-president, general manager, and executive authority of the defendant, Rapkin had Boheim with him a substantial part of the day and for about twenty days thereafter to assist in what was admittedly merely clerical work, and which, commencing around May 21st, was again handled directly by defendant's employees. Neither Boheim nor plaintiff had any further transactions with defendant, although it appears that at a special meeting on May 16, 1945, of stockholders of Vilter Company (the stock of which was then owned by Foundation, Inc., and voted by its officers, who were said four associates of the Miller firm) all actions by the board of directors at the meetings of May 1 and May 8, 1945, in relation or pursuant to resolutions adopted by and reported to the stockholders at said meetings on May 1st and

May 8th were ratified and confirmed in an omnibus manner without specifying particularly what matters were intended to be thus approved. And it does not appear that the directors or stockholders of Vilter Company at any meeting ever expressly ordered or directed the payment of $30,000 to plaintiff.

In relation to plaintiff's bill or statement for $30,000 there was evidence on the trial which the court could consider credible and sufficient to fully warrant the following findings and conclusions by the court, to wit:

"Said statement was false in that at no time prior to May 1, 1945, was either the plaintiff or Mr. Boheim employed by the defendant [Vilter Company] for any purpose whatsoever, and at no time did they or either of them render any services for the defendant, or of any benefit to the defendant, whether in connection with the financing of defendant, or otherwise, and at no time prior to May 1, 1945, were they or either of them requested to render any service for defendant, by any of its officers, directors, stockholders, or employees; and all services rendered prior to May 1, 1945, by Mr. Boheim, or by any employees of any enterprise with which he was associated, related solely to his efforts to earn a contingent commission or finder's fee by producing a successful bidder for the purchase of defendant's stock from the holders thereof.

"On and prior to April 30, 1945, Mr. Rapkin was not an officer, employee, or agent of defendant, nor was he then acting nor had he previously acted as an attorney for defendant; and Mr. Rapkin then had no authority, actual or apparent, to employ either or both the plaintiff or Mr. Boheim on behalf of defendant for any purpose whatsoever, or to request either or both of them to render any services to or for the defendant, or to incur any obligation or make any agreement for or on behalf of defendant; and Mr. Rapkin did not employ or purport to employ either or both the plaintiff or Mr. Boheim on behalf of the defendant, or to render any services to it. . . .

"On May 1, 1945, after he became a vice-president of defendant, Mr. Rapkin orally promised Mr. Boheim that de-

fendant would pay the $30,000 invoice referred to in finding 9. At the time of such promise defendant was not indebted to plaintiff; there was no consideration to support the promise; Mr. Rapkin was a fiduciary both for the defendant and for Foundation, Inc.; he was precluded from making or agreeing to make any gift of any of defendant's assets, or any disposition thereof excepting in the regular course of the business of defendant; the promise was contrary to the best interest of defendant and Foundation, Inc.; and neither defendant nor Foundation, Inc., derived or could derive any benefit therefrom; the promise was an agreement to make a gift; Mr. Rapkin had no authority to make the same without the consent and approval of his senior officer Earl B. Tilton; and the promise was and is void and unenforceable.

"On May 8, 1945, Mr. Rapkin made the following report to a meeting of the board of directors of defendant:

" 'In the course of this explanation he reported that a statement dated April 30, 1945, addressed to the company had been delivered to him by Western Industries, Inc., in the sum of $30,000. The statement was for services previously rendered to the company, in an amount agreed by Mr. Foley as president and Mr. Rapkin as vice-president, with the board's approval.' The board then considered other matters in detail but did not discuss the $30,000 claim, and thereafter a resolution was adopted ratifying 'the action of the company's officers with respect to any and all matters reported at this meeting.'

"The report to the board was incorrect, since plaintiff had not 'previously rendered' any services to defendant; and any attempted ratification based upon such erroneous information was and is nugatory. Independent of such consideration, the said general resolution of ratification was and is insufficient to constitute an adoption or approval of the $30,000 statement; and the board of directors of defendant, as fiduciaries representing Foundation, Inc., had no power or authority to pay or authorize the payment of plaintiff's fictitious claim. Neither defendant nor Foundation, Inc., at any time agreed to pay plaintiff said sum of $30,000."

To those findings there is applicable the rule that although there are conflicts in some of the testimony of the witnesses,

the determination of their credibility and the weight of their testimony was primarily for the trial court, and that as there was sufficient basis in the evidence to sustain its findings and they are not contrary to the clear preponderance of the credible evidence, they cannot be disturbed on this appeal, and therefore must be sustained. *Interior Woodwork Co. v. Buhler,* 207 Wis. 1, 6, 238 N. W. 822.

It follows that as up to May 1, 1945, neither the claimed activities of plaintiff or Boheim were pursuant to any request or promise by Vilter Company and did not result in any benefit or value to it, they do not constitute any consideration for any legal obligation or the payment thereof by Vilter Company to plaintiff. As stated in *Dilweg v. Milwaukee M. T. Co.* 174 Wis. 200, 201, 202, 182 N. W. 726,—

"It is well established that 'to entitle a broker to compensation he must have been employed to negotiate the transaction in connection with which his services were rendered. In the absence of such employment or, in other words, where the broker acts as a mere volunteer, he is not entitled to compensation, although his services are the efficient cause of bringing the parties together and result in a sale or other contract between them.' . . . Conceding that the colloquy set forth in the statement of facts amounted to a promise on the part of Trecker that a broker's commission would be paid to plaintiff if a contract were consummated, it is apparent that there was no consideration for the promise, as the only services rendered by the plaintiff upon which he relies as entitling him to a commission were already performed." See also 1 Williston, Contracts (rev. ed.), p. 508, sec. 142.

Consequently as there was no legal obligation on the part of Vilter Company or Foundation, Inc., for their payment of any amount whatsoever to the plaintiff or Boheim, there is applicable the rule that corporate officers and directors of a corporation are trustees and that as such they are precluded from making a gift of corporate assets to themselves or to other private parties. As stated is 3 Fletcher, Cyc. Corp. (perm. ed.),—

" 'The directors of a corporation are intrusted with the management of its business and property for the benefit of all the stockholders, and occupy the position of trustees for the collective body of stockholders in respect to such business. . . . It is their duty to administer the corporate affairs for the common benefit of all the stockholders, and exercise their best care, skill, and judgment in the management of the corporation business solely in the interest of the corporation.' " 3 Fletcher, Cyc. Corp. (perm. ed.), p. 178, sec. 838.

"Of course, if the corporation has no power to make the donation, the board of directors is without such power. And therefore an appropriation of the funds of a company as a gift, by the act of the directors without the consent of the stockholders, would ordinarily be a misappropriation, certainly an act beyond the corporate powers of the directors. . . ." 2 Fletcher, Cyc. Corp. (perm. ed.), p. 407, sec. 520 (Citing *Frankfort Bank v. Johnson,* 24 Me. 490, 502; *Bedford R. Co. v. Bowser,* 48 Pa. St. 29, 31; *Holland Banking Co. v. Continental Nat. Bank,* 324 Mo. 1, 22 S. W. (2d) 821, 826; *Parrott v. Noel,* 8 Fed. (2d) 368, 371; *Moss v. Copelof,* 235 Mass. 162, 126 N. E. 474, 476; *Brinkerhoff Zinc Co. v. Boyd,* 192 Mo. 597, 91 S. W. 523.)

Those rules should be considered particularly applicable in this action because of the facts that Foundation, Inc., as organized is a charitable corporation and that by its purchase of all shares of Vilter Company stock it is to all intents and purposes virtually the owner of the assets of Vilter Company; and under those circumstances the payment of $30,000 of its assets to plaintiff would be a gross misappropriation of assets of Foundation, Inc., which were to be used for its charitable purposes.

It follows that it is my conclusion that the judgment should be affirmed.

Mr. Justice HUGHES and Mr. Justice BROADFOOT authorize me to add that they concur in this dissent.