Estate of Stronks: Kujava, Appellant, v. Gates, Executrix, and another, Respondents.

*September 7—October 3, 1961.*

For the appellant there were briefs by *Muchin & Muchin* of Manitowoc, attorneys, and *Charne & Kops* of Milwaukee of counsel, and oral argument by *Jacob Muchin* and *Irvin B. Charne*.

For the respondents there was a brief and oral argument by *R. O. Schwartz* of Manitowoc.

BROADFOOT, J.  At the time of her death Mrs. Stronks had two daughters, Mrs. Dorothy Gates, aged forty-nine, issue of a first marriage, the proponent of the will, and Mrs.

Eileen Kujava, aged forty-four, the issue of a second marriage, who is the objector. By the instrument dated September 22, 1960, Mrs. Stronks bequeathed $1,000 to Eileen Kujava, $1,000 to Albert Gates, the husband of Dorothy Gates, and the balance of the estate was devised and bequeathed to Dorothy Gates, who was nominated as executrix, without bond. By the terms of a prior will dated June 2, 1958, Mrs. Stronks had bequeathed $5,000 to Virginia Stiefvater, nee Gates, and $1,000 to each of her other grandchildren living at the time of her death, including Larry Kujava, an adopted child of her daughter Eileen. The record shows two other grandchildren, Rosemary Kujava and Neil Gates. Of the residue one half was to go to Dorothy Gates outright and the other half in trust for the benefit of Eileen Kujava.

Mrs. Stronks fell and broke her left hip on April 13, 1960. She was taken to Memorial Hospital at Manitowoc and remained there until her death. On April 15, 1960, an operation on the left hip was performed and a nail was inserted to join the broken bone. Because of an unsatisfactory union another operation was performed on July 14th. During her entire stay in the hospital her attending physician and surgeon was Dr. R. W. Hammond.

In a decision that reviewed the testimony, the county court held that the instrument propounded as the last will of Mrs. Stronks was properly executed; that on the date thereof the testatrix possessed testamentary capacity to make a will, and that the will was not the result of undue influence. Upon this appeal the objector takes no issue with the determination that the instrument was properly executed but confines her argument to the other objections.

Approximately a dozen witnesses were called by each of the parties and the transcript of the testimony in the record comprises 327 pages. Exhibits at the trial make up 269 pages of the record. To digest all of the testimony and con-

tents of the exhibits would unduly lengthen this opinion. We shall confine our discussion thereof to some comment on the testimony of the more-important witnesses.

## I. *Testamentary Capacity.*

As to this issue the objector relies primarily upon the testimony of two doctors and of one of the attesting witnesses. The first medical witness called was Dr. J. H. Fodden, a pathologist who performed an autopsy. In his report of the autopsy he gave the cause of death as bilateral pulmonary consolidation of bronchopneumonic type, and contributory causes as uremia and acute congestive cardiac failure. It was his conclusion as a result of his autopsy that Mrs. Stronks was of unsound mind. In commenting upon the testimony of Dr. Fodden, the trial court said:

"Dr. Fodden, however, was surprised by the inclusion of a cerebral vascular accident in the question since his examination showed no anatomical signs in the brain. Nor was there evidence in his examination of convulsive uremia ('due to spasms of the cerebral arteries or to increase of intracranial tension'—Dorland's Illus. Med. Dic. 23d ed.).

"Although the doctor's testimony outlined the course of uremia and was emphatic that it invariably affected the brain, he found no morphological changes. He was frank in stating: (1) He had not known Mrs. Stronks in her lifetime, (2) the effects of uremia—or any disease—can and do vary from person to person; and (3) the deceased could have had a lucid interval on September 22, 1960."

According to the transcript of his testimony Dr. Fodden was more positive in his statement that Mrs. Stronks was having a lucid interval. According to the transcript his statement is as follows:

"*Q.* Would you say she had a lucid interval to an extent to make a will at that time? *A.* There are two questions.

The first one, she was having a lucid interval, I am sure of that."

Dr. Hammond was the second medical witness called and he testified that on September 22, 1960, Mrs. Stronks had marked edema, severe secondary anemia, enlarged liver, pulmonary congestion of pneumonities, enlarged heart, and uremia, producing a lethargic mental condition. It was his conclusion that on or about September 22, 1960, Mrs. Stronks' mental condition was seriously impaired. In commenting on the testimony of Dr. Hammond the trial court said:

"It is unfortunate that his testimony cannot be more specific; his recollection had to be prompted by review of hospital and medical notes.

"Although he was of the opinion that Mrs. Stronks was suffering serious mental impairment on September 22, 1960, caused by uremia and that she had had a cerebral vascular accident on July 6, 1960, he was blunt in his statements that there was no toxic psychosis or any delusions or hallucinations. He noted that her condition was variable from day to day; that her condition had markedly improved for a time after the second operation. To a hypothetical question, which included the legal test of capacity for the execution of the will, and other specific questions relating to competency, Dr. Hammond was pointedly honest: He did not know; he wasn't there; it was a matter of proof; that must depend on the person."

The scrivener of the will testified to the drafting thereof and its execution. Needing a second attesting witness, he summoned a nurse on the floor and asked her to act as a witness. After Mrs. Stronks signed the will the nurse, whose name was Virginia Trierweiler, signed as an attesting witness and then the scrivener signed as the second attesting witness. The scrivener testified that he then pointed to the last part of the attestation clause which recited that Mrs.

Stronks was then of sound and disposing mind and memory and asked Mrs. Trierweiler if there was any question about that, and it was his recollection that she said, "None whatever." When Mrs. Trierweiler was called as a witness for the proponent she testified that she signed the will and that her attention was called to the last two lines of the attestation clause. She testified that she was asked a question concerning that and she answered in the affirmative, but was sorry she did because she did not think Mrs. Stronks was in her right, sound mind. Later she was called as a witness by the objector and stated that when she answered the question in the affirmative she merely meant that she had read the last two lines of the attestation clause. In commenting upon the testimony of Mrs. Trierweiler the trial court had this to say:

"But the court remains confronted with what appears to be an impeachment of her own acts—the testimony of Mrs. Virginia Trierweiler, the other witness. We approach her testimony with the caution dictated by our supreme court in *Estate of Knutson, supra* [275 Wis. 380, 82 N. W. (2d) 196]; in that case there was a real conflict of testimony between the subscribing witnesses.

"In the instant situation, Mrs. Trierweiler has not made any specific statement that Mrs. Stronks was mentally incompetent on September 22, 1960, when the will was executed. She is apparently a competent, poised professional in her own field, but now an innocent confronted with the terrors of the Law—awesome things like subpoenas, lawyers, judges, courtrooms, oaths, and witnesses—just like a morbid T.V. program!

"The witness wanted to do what was right. The murk of the unknown has taken away her certainty. She was unprepared for a situation where neither her 'Yes' or 'No' would be wholly acceptable by the persons apparently appealing to her for truth and justice. The result: Lack of certainty.

"Yet her testimony is positive on elements of competency: Although she had never engaged in conversation of more than two or three minutes with Mrs. Stronks, in so far as September 22, 1960, is concerned, Mrs. Trierweiler believed the testatrix certainly recognized her as a familiar nurse, believed Mrs. Stronks would have known her family and was apparently in a cheerful and good mood.

"It is the court's conclusion that Virginia Trierweiler's testimony is not so much contradictory of Mr. Dicke as hesitatingly supportive of his positive testimony."

The objector disagrees violently with the comments of the trial court about the testimony of Mrs. Trierweiler and the inferences it drew therefrom.

In *Will of Szperka,* 254 Wis. 153, 158, 35 N. W. (2d) 209, 35 N. W. (2d) 911, this court commented on the attempted impeachment of a will by an attesting witness after signing an attestation clause, reciting that the testatrix was of sound mind, and stated that such testimony should be received with caution and suspicion. In that case we quoted 1 Page, Wills (2d ed.), p. 1162, sec. 696, as follows:

"If the subscribing witnesses testify adversely to the capacity of testator, they have under oath stated that he was incompetent to make a will, while by their solemn acts in subscribing as witnesses they have in effect formally declared that he was competent. Accordingly, their testimony adverse to the capacity of testator is, under such circumstances, of but little value. . . . Such evidence may be insufficient to overcome the presumption of sanity."

We followed the rule laid down in Page in deciding the last-cited case.

The trial court reviewed the testimony of the scrivener, Fred G. Dicke, an attorney who has practiced law since 1939. The court gave great credence to the testimony of Mr. Dicke. In *Estate of Knutson,* 275 Wis. 380, 82 N. W. (2d) 196, we held that, on the issue of testamentary ca-

pacity, the testimony of the attorney-scrivener was properly given great weight since he had discussed the affairs of the testatrix with her at length and with professional understanding when she gave him instructions for the will, and he was present at its execution. See also *Estate of Kesich,* 244 Wis. 374, 383, 12 N. W. (2d) 688, and cases there cited.

The objector, however, contends that the trial court erred in giving such great credence to Mr. Dicke's testimony because of his interest in the case and because of his limited opportunity to observe the testatrix. Mr. Dicke was first contacted by Mrs. Gates relative to drafting the will for Mrs. Stronks. He was not acquainted with Mrs. Stronks or any of her family and had never done any business for any of them. His opportunity for observation was limited to the time spent in discussing with testatrix the provisions she wished to have put in her will, a period of twenty to thirty minutes, and further conversation when he returned to the hospital after drafting the will to have it executed. After the death of testatrix, Mr. Dicke filed the petition for probate of the will. When the objections were filed another attorney was substituted and Mr. Dicke, so far as the will contest is concerned, was merely a witness. The substituted attorney filed the brief in this court and argued the matter. Mr. Dicke does not appear of record.

The objector cites *Will of Cieszynski,* 207 Wis. 353, 241 N. W. 364, in which this court criticized the propriety of an attorney acting as a witness in a matter in which he was conducting the litigation. The opinion in that case indicates that the attorney who drafted the will conducted the litigation in the will contest, gave his testimony, and continued to appear in the litigation. The objector also cites one sentence from 3 Jones, Evidence, Civil Cases (4th ed.), p. 1360, sec. 754. The entire portion thereof dealing with

the subject of an attorney appearing as a witness for a client is as follows:

"No rule of law prohibits the attorney of a party who prosecutes or defends a civil action from testifying at the instance of his client. In some cases, it may be unseemly, especially if counsel is in a position to comment on his testimony; and the practice has often been severely criticized by the courts. It has even been held to be reversible error to permit an attorney to continue to act as such after having testified for his client. Nevertheless the competency of the attorney as a witness is conceded and there are often cases in which it may be quite important, if not indispensable, that the testimony be admitted in order to prevent an injustice or to redress a wrong. In some of the states, statutes or rules of court limit the right of attorneys to testify or to participate in the argument after having testified."

In the *Cieszynski Case, supra,* this court affirmed the judgment of the county court admitting the will to probate and did not say that the testimony was inadmissible. Nor does Jones in his work on evidence so state.

## II. *Undue Influence.*

Before the county court, the objector contended that the will of September 22, 1960, was procured by undue influence exercised over and upon Mrs. Stronks by Dorothy Gates, the chief beneficiary thereof. That court held that she had failed to produce a sufficient quantum and quality of evidence to meet her burden of proof. Upon appeal she claims the county court was in error in so holding and that the record fully sustains her contention.

In order to sustain her contention the objector had to prove the following: (1) That Mrs. Stronks was a person unquestionably subject to undue influence; (2) that Dorothy Gates had opportunity to exercise such influence; (3) that

Dorothy Gates had a disposition to influence her mother unduly for the purpose of procuring improper favor; and (4) a result clearly appearing to be the effect of the undue influence. *Estate of Knutson, supra.* Moreover, since undue influence is akin to fraud, the objector had to sustain her burden of proof by clear and satisfactory evidence. *Will of Winnemann,* 272 Wis. 643, 76 N. W. (2d) 616.

The objector points to the medical testimony to show that Mrs. Stronks was a person subject to undue influence. Other witnesses testified that her great desire for weeks before her death was to go home. Her daughter Mrs. Gates so testified. Dr. Hammond testified that persons seriously sick are influenced by their relatives. He did not say in what way, nor that any of the relatives did so influence her. Nurses testified that Mrs. Stronks would refuse to eat, to take medicine, and to get up and try to walk on crutches but that they could persuade her to do so.

Objector states it is difficult to see how any person as sick as was Mrs. Stronks, subjected to hospitalization and the medical and surgical treatment she received, would have the physical stamina to resist undue influence even if her mental condition were not affected; and these facts are an indication that she lacked the physical, let alone the mental, will and strength to resist persuasion. Mrs. Stronks was, without doubt, a very sick woman on September 22, 1960. Such indications, however, are not sufficient proof.

The trial judge commented that several witnesses expressed sympathy for the objector, and surprise and indignation because of unequal treatment of the two daughters, but that there was a paucity of evidence that Mrs. Stronks was amenable to suggestion. Further, that the generalizations of coaxing a sick woman to eat or get up on crutches are not in point and are more than counterbalanced by other testimony of how she lived and what she did.

There can be no question from the record that Dorothy Gates had ample opportunity to exercise undue influence. She lived in the same city, transacted all of her mother's business after she entered the hospital, and visited her there several times each week.

As to the disposition of Mrs. Gates to influence her mother for the purpose of procuring an improper favor, the objector points to the provisions of the two wills and states that a comparison of the two is a sufficient reason for such a disposition. That might establish a motive if that were the issue, but, by itself, it does not establish disposition, nor does the claim that there was no close relationship between Mrs. Gates and Mrs. Kujava. Attention is directed to testimony that Mrs. Gates evinced quite an interest in her mother at approximately the date of the will; that in the opinion of a nurse, Mrs. Gates was not a good influence on her mother; that Mrs. Stronks complained to a nurse that Mrs. Gates upset her; and that Mrs. Gates did not invite her sister to her home until after the will was executed. The objector infers from this that the attitude of Mrs. Gates toward her mother and sister changed after she had accomplished her purpose. The undisputed testimony of Mrs. Gates that she did not know the contents of the will until after her mother's death is called incredible. The trial court found that statement by Mrs. Gates to be true.

In connection with the subject of the disposition of Mrs. Gates to exercise undue influence, the objector states that the will was drawn in absolute secrecy, and the terms were never discussed by the attorney in anyone's presence. The objector then poses the following question: "If there wasn't any doubt about the mental capacity of Mrs. Stronks, why weren't witnesses used who were present when the provisions of the will were discussed with Mrs. Stronks or when the will was witnessed?" Quotations are made from *Estate of*

*Knutson, supra,* and *Will of Winnemann, supra.* The first shows that a physician who examined the testatrix three weeks after the will was made testified as to her competency. The second shows that a doctor had been called in to make certain of the competency of the testatrix before the execution of the will. In neither case does the opinion indicate that the doctor was present when the provisions for the will were given to the scrivener. In *Will of Rasmussen,* 1 Wis. (2d) 615, 85 N. W. (2d) 383, a daughter of the testatrix and a workman were in the hospital room when testatrix and the scrivener discussed the provisions to be inserted in the will and the daughter was present when the will was executed. This does not establish a precedent nor a requirement even when the competency of a testatrix may be challenged. A testatrix might want some relative or friend present, but an attorney would be subject to severe criticism if he did not keep the secrets of his client inviolate.

In commenting on this phase of the case the trial court said:

"If Dorothy Gates is the embodiment of 'all that is cool, calculating, and ruthless' her activities do not reflect such character. Instead of demonstrating foresight and subtlety, she antagonized the attending physician and hospital staff in her concern for her mother's care. She had quarreled on several occasions with her mother. She failed to seek or keep her mother under her dominance."

Finally, it is contended that the will of September 22, 1960, clearly appears to be the effect of the undue influence by Mrs. Gates. It is argued that the will is an unnatural one; the testimony that the Kujavas were extravagant and were living beyond their means is without foundation; a normal relationship existed between the testatrix and Eileen Kujava; there is no plausible explanation as to why testatrix favored the proponent and chief beneficiary over con-

testant; and there is no explanation to show why the grand-children should have been omitted from the will.

The trial court found that the will was not an unnatural one. It found that the testatrix had paid medical bills for the objector and was concerned about her thrift and that of her husband. Testatrix was also concerned about her continuing high hospital, medical, and surgical expenses. Even in the 1958 will the Gates family was favored because Mrs. Stiefvater, nee Gates, was bequeathed the sum of $5,000. The trial court further commented on the fact that the two daughters are the issue of different marriages and the testatrix had closer and more-frequent contacts with Dorothy Gates. It concluded by stating:

"Appealing and sincere as most of the opponent's witnesses were, this court cannot substitute inferences, hopes, and unwarranted conclusions for the legal tests. The will being admitted is that of Mrs. Stronks justified and sustained by the trial—regardless of what her personal motivations and concerns were."

This is obviously a fact case. The trial judge was the trier of the facts. He was the sole judge of the weight and credibility to be given to the testimony of the different witnesses. This court has many times commented upon the fact that the trial court sees the witnesses, observes their conduct and demeanor in court, and is in a position to determine such questions. Therefore, the findings of fact by a trial court must be sustained unless they are against the great weight and clear preponderance of the evidence. *Will of Winnemann, supra; Will of Dobson,* 258 Wis. 587, 46 N. W. (2d) 758. From a consideration of the evidence as a whole we cannot say that the trial court's findings were against the great weight and clear preponderance of the evidence.

*By the Court.*—The two orders appealed from are affirmed.