LORENZ, Appellant, v. WOLFF and others, Respondents.

*No. 102. Argued December 1, 1969.—Decided January 9, 1970.*
(Also reported in 173 N. W. 2d 129.)

---

410

For the appellant there was a brief by *Doar, Drill & Norman* of New Richmond, attorneys, and *Thomas F. Burns* of St. Paul, Minnesota, of counsel, and oral argument by *W. T. Doar, Jr.*

For the respondents there was a brief by *Gwin, Fetzner, Richards & Skow* of Hudson, and oral argument by *John W. Fetzner.*

HEFFERNAN, J. The basic question, of course, is whether the aneurysm was caused by the accident, or to state it alternatively whether a pre-existing aneurysm was aggravated by the accident. There was evidence by competent medical witnesses whose opinion it was that the

aneurysm and the subsequent disability were the result of the automobile accident injury. Other physicians expressed the contrary opinion.

Dr. Merrick, in a letter which was placed in evidence, concluded sometime prior to trial that the aneurysm was not caused by the trauma, inasmuch as he believed that severe manifestations would have developed within a very short time of the accident had such been the case. It was his opinion that almost all aneurysms were the result of congenital conditions which resulted in improper development of the arteries. Subsequently, on trial, however, a hypothetical question was posed to Dr. Merrick. In addition to the information which Dr. Merrick originally had, the hypothetical question placed in evidence additional facts which were not at Dr. Merrick's disposal when he gave his original opinion in the letter. This evidence consisted of testimony by Lorenz and others that he suffered severe headaches from the time of the accident until the severe seizure on April 25th and that he did have a period of temporary blindness within a few days of the accident.

At least five other witnesses, some of whom were Lorenz's fellow workmen, testified that Lorenz had complained of a "terrible headache." One of the witnesses, who came upon the scene of the accident, saw Lorenz at a nearby store and stated that Lorenz complained he had an "awful headache."

After being apprised of this additional history, Dr. Merrick stated, "to a reasonable medical probability," that the headaches were related to the aneurysm and that the aneurysm was enlarged as a result of the accident of January 14th.

Dr. Edward A. Post, in response to a hypothetical question containing the same information, concluded that the accident of January 14th started the chain of events which weakened the wall of the aneurysm, caused the headaches, and caused the difficulty which became acute in April, 1963.

Dr. Abraham Falk testified that the trauma of the accident caused the aneurysm, or caused the aneurysm previously present to increase in size, and that the aggravated condition of the aneurysm caused the partial paralysis and blindness.

While there is some discrepancy of opinion in the testimony of all plaintiff's medical experts in respect to whether or not the aneurysm was probably present before the accident, all agreed that the enlarged condition of the aneurysm, which resulted in blindness and paralysis, was caused by the accident.

The defense called medical witnesses who testified that in their treatment of Oliver Lorenz, both before and after the accident, he did not evince symptoms that they would have attributed to an aneurysm.

One of these physicians stated that the plaintiff had originally complained to him of pain in his lower back and neck, but he did not complain of headaches.

Another physician called by the defense testified that as early as 1961 Lorenz had seen him complaining of severe headaches, but that when he had seen him on February 9, 1963, he complained about a pain in his neck and upper back. He diagnosed Lorenz's problem at that time as being a "muscular ligamentous strain of the cervical thoracic spine."

Under these circumstances, it is clear that there was evidence from which a jury could have concluded that the aneurysm or aggravation of that condition was caused by the accident and resulted in the partial blindness and partial paralysis. On the other hand, there was some testimony from which the jury could have concluded that the aggravation of the aneurysm and the manifestations of blindness and paralysis were coincidental and not related to the accident. The fact of the matter is that plaintiff's witnesses were of the opinion to the required degree of medical certainty that the disability was the result of the accident, while defendants' witnesses merely disavowed any knowledge that there was evidence of

an aneurysm or disability therefrom prior to the April 25th seizure. Under ordinary circumstances we would therefore conclude, although plaintiff's evidence seems more convincing, that since there was credible evidence to support the jury's verdict, this court will not set aside that verdict in the interest of justice.

We conclude, however, from a review of the transcript, that certain conduct during the course of trial may have so prejudiced the jury that it failed to impartially and unprejudicedly evaluate the truth and veracity of Oliver Lorenz.

The principal contention of the plaintiff is that defense counsel indulged in improper and prejudicial questioning and argument, the purpose of which was to undermine the credibility of Lorenz's testimony and in fact unfairly did so.

Sec. 251.09, Stats., provides:

"251.09 **Discretionary reversal.** In any action or proceeding brought to the supreme court by appeal or writ of error, if it shall appear to that court from the record, that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the supreme court may in its discretion reverse the judgment or order appealed from, regardless of the question whether proper motions, objections, or exceptions appear in the record or not . . . as shall be deemed necessary to accomplish the ends of justice."

We have frequently said that reliance upon sec. 251.09, Stats., is discretionary with this court and before it will exercise its discretion:

". . . it must be convinced that there has been a miscarriage of justice. This means [in the mine-run case] the evidence and the law must be such that the plaintiff probably should have won and should therefore be given another chance." *Savina v. Wisconsin Gas Co.* (1967), 36 Wis. 2d 694, 704, 154 N. W. 2d 237.

While such is the usual rule, this court in its discretion is not necessarily confined to such a mechanistic formula for the determination of whether justice has miscarried.

The statute cited above provides, in addition, that there may be a discretionary reversal when it is "probable that justice has for any reason miscarried."

On the basis of the facts as set forth hereinabove, it is apparent that we cannot say, using the mechanistic rule of *Savina,* that on a retrial the plaintiff would probably win. The causal relationship between the accident and the blindness and paralysis is hotly disputed, and it is one upon which reasonable juries, under the state of the evidence of record, might have come to different conclusions. We are concerned, however, that in the totality of the circumstances of the case the evidence may not have been fairly weighed.

The essence of the plaintiff's case was that he had been injured in the automobile accident; that he had almost immediately thereafter sustained the onset of severe headaches; that he had a period of temporary blindness; that this condition culminated in the severe intracranial accident on April 25th; and that he has been permanently disabled thereafter.

The defendants' case rested primarily upon the proposition that the plaintiff had no symptoms relevant to an aneurysm until April 25th; that he did not have severe headaches or, if he did, they predated the accident; and that his disability was not as severe as he contended it was.

Essentially, the determination of these two conflicting positions rested upon the degree of credibility that the jury might attribute to Lorenz. The appellant points out a series of incidents at trial which he contends were so highly prejudicial as to prevent the jury from fairly reaching a just conclusion on this issue.

The alleged series of prejudicial questions arose out of an incident which occurred at the Hudson dump on the Saturday before the trial began. It is undisputed that Lorenz rode to the Hudson dump with his son-in-law, who wished to get rid of a trailer load of trash. On the same day, Attorney John Fetzner with his son David

cleaned their garage and drove to the dump to get rid of their accumulated trash. Fetzner parked his automobile near the car in which Lorenz had ridden to the dump.

Fetzner and his son were convinced that Lorenz was up in the trailer helping to unload the trash when they arrived and that Lorenz jumped down out of the trailer when he saw Fetzner. On cross-examination Lorenz denied that he had been in the trailer and stated that he was standing beside the trailer when the Fetzner automobile drove in. Thereafter the following dialogue ensued between the plaintiff and the defense attorney:

"Q. Now, isn't it a fact that when I backed in that you were up in the box of a trailer helping—

"A. Oh, no; no. I was not in the trailer at all. I was standing there watching my son-in-law clean the trailer off.

"Q. All right. You deny that?

"A. This is right.

"Q. Now, Mr. Lorenz, isn't it a fact that as I got out of the car that you got down and then stood alongside of your trailer?

"A. Who told you this? Did you see this?

"Q. That's what I saw.

"A. No.

"Q. Which my son saw?

"A. No.

"Mr. Burns: May counsel be put under oath before he testifies.

"Q. (By Mr. Fetzner, continuing) You may deny it, Mr. Lorenz, if you wish. I am just asking you if that isn't a fact?

"A. That is not a fact.

"Mr. Burns: If the Court please, may counsel be put under oath before he testifies.

"The Court: Approach the bench, please.

(Discussion had at the bench out of the hearing of the jury.)

"The Court: The Court will instruct the jury as to any remarks made by Mr. Fetzner as to what he saw are to be entirely disregarded. While counsel has a duty to ask questions, they themselves cannot testify as to facts that they know unless they wish to appear as witnesses.

Mr. Fetzner has not at this point in the trial appeared as a witness, but merely as an attorney for the defense. Therefore, any statements that may have been made as in the form of being a witness are to be entirely disregarded. Is counsel satisfied with the instruction?

"*Mr. Burns:* It's probably the best that can be done to deal with a bad situation.

"*The Court:* If you will disregard the remark, the last remark of Mr. Burns.

"*Q.* (By Mr. Fetzner, continuing) Mr. Lorenz, all I am asking you is if you deny that at the time that you were at the dump on this last Saturday—

"*A.* Uh huh.

"*Q.* That at the time you saw me and recognized me, which I assume you did, that you got down out of the box?

"*Mr. Burns:* Same objection.

"*The Court:* Sustained.

"*Mr. Fetzner:* I will withdraw the question, if there is any question about it."

Shortly thereafter Attorney Fetzner, in the presence of the jury, addressed the court:

"Your Honor, I would request the Court now, in view of the prior questions, that I be allowed to be sworn and testify as to my observations on this last Saturday afternoon at the dump here in Hudson with regard to my observations of Mr. Lorenz."

After a short discussion in chambers, Attorney Fetzner withdrew his request because of his desire to remain in the case. Several hundred transcript pages later, Attorney Fetzner returned to the dump incident during his recross-examination of the plaintiff:

"*Q.* Now then, Mr. Lorenz, isn't it a fact that when my son got out of the car that you were up in that trailer with some man helping unload it?

"*A.* No, I was not.

"*Q.* You deny that?

"*A.* I certainly do deny it.

"*Q.* All right. And you realize the only reason I even ask with reference to the dump was to determine if you're telling the truth.

"*Mr. Burns:* Oh, if the Court please, improper cross-examination or recross-examination; misstatement of motives, purity.

"*The Court:* Just a minute.

"*Mr. Fetzner:* I will rephrase the question.

"*Mr. Burns:* Well, it's not enough to rephrase the question.

"*The Court:* The Court will sustain the objection and the jury is instructed to disregard any such comment.

"*Mr. Burns:* Again, as I have asked the Court several times, will the Court instruct counsel not to pronounce the purity of his motives in respect to each question he asks.

"*The Court:* Counsel, we have talked about speech making. Let's proceed with the trial on both sides.

"*Mr. Burns:* My motion is denied?

"*The Court:* Both of you know what you are here for, and we are here to try this lawsuit and let's get on with it.

"Q. (By Mr. Fetzner, continuing) But you deny here and now that you were up in that trailer unloading it when that young boy came around the back of the car?

"*Mr. Burns:* Objected to as repetitious.

"*The Court:* Sustained. He has already made this denial."

Later in the trial, Attorney Fetzner's son testified that two men "were up in the trailer about in the middle . . . unloading and throwing stuff out." He testified that one man "got out" of the trailer, walked over to him and his dad, and began talking. Fetzner's son identified this man as the plaintiff, Oliver Lorenz.

During his closing argument, Attorney Fetzner made the following statements, which the plaintiff claims additionally prejudiced his case in the minds of the jury:

"Now, one very significant thing here going to the truth which I think is very, very important. It's important to a father who has two goods eyes and it's also important because I think it tells the basis, again going to the fact of honesty, truth and good justice. This isn't something we learn in law school. Truth and honesty is something we have learned at home, that we were brought up with."

"But the crucial thing is, that my son David identified Mr. Lorenz."

"We have eyes. My son has two good eyes and I am satisfied, as sure as I am standing in front of you people, that Mr. Lorenz was in that trailer."

At the outset, defendant contends that, under the rule of *Kink v. Combs* (1965), 28 Wis. 2d 65, 135 N. W. 2d 789, the plaintiff is foreclosed from objecting to the defense attorney's conduct because he did not make a motion for a mistrial. A review of the cases in which the rule urged by the defendant was applied shows the chief reliance of the party urging a reversal was not in sec. 251.09, Stats., but upon other alleged errors. We see no Wisconsin precedent which enables the defendants to take advantage of the rule in *Kink*. More importantly, the provisions of that statute state the nature of the discretionary power in this court. As was pointed out above, sec. 251.09 provides that the court's discretion may be exercised regardless of the question of whether proper motions, objections, or exceptions appear in the record or not. It therefore seems clear that the plaintiff is not foreclosed by the *Kink* rule merely because he failed to move for a mistrial.

Pertinent to what happened at the trial are the provisions of the *Code of Professional Responsibility*, as proposed by the American Bar Association, which, with modifications, have been adopted by this court, to be effective on January 1, 1970. Therein, under *Disciplinary Rules* referring to *Trial Conduct* appears the provisions of DR 7–106 (C) :

"In appearing in his professional capacity before a tribunal, a lawyer shall not:

". . .

"(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.

"(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein." 43 Wis. 2d lxiii.

The new rule, of course, does not cover the conduct of trial counsel in this case. It is, however, an amplification of Canon of Professional Ethics No. 19 of the American Bar Association, which at the time of trial was in effect for all Wisconsin lawyers. That canon provides:

"When a lawyer is witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client."

The violation of this canon has been a matter of concern for this court from time to time since its adoption.

In *Roys v. First Nat. Bank* (1924), 183 Wis. 10, 197 N. W. 237, the trial attorney also appeared as a witness in an action to recover funds from the estate of a bankrupt. While the judgment of the trial court was not reversed on the basis of the conduct of the trial attorney alone, the court nevertheless stated:

"On the question of the propriety of an attorney in a case appearing as a witness to contested facts, we call attention to the canons of ethics of the American Bar Association . . . .
"This rule is not to be followed simply because the American Bar Association has adopted it, but with better reason because it states ethical considerations that must appeal to every lawyer as sound. A lawyer has a retainer —as a witness he is not entitled to such. He will find it hard to disassociate his relation to his client as a lawyer and his relation to the party as a witness. This case bears witness of that fact." (pp. 20, 21)

In *Zeidler v. State* (1926), 189 Wis. 44, 206 N. W. 872, this court, following the rationale of *Roys v. First Nat. Bank, supra,* deplored the practice indulged in by the district attorney in offering himself as a witness while he was in active charge of the prosecution. The court pointed out that, if the interest of justice required that the district attorney testify, he should withdraw from the active prosecution of the case and appoint some other

attorney to perform his duties. The court also commented on arguments to the jury, wherein the district attorney declared his personal beliefs as to the guilt of the defendant. The court pointed out that this conduct, although not in itself reversible error, was highly improper.

In *Baumgartner v. State* (1929), 198 Wis. 180, 186, 223 N. W. 419, 224 N. W. 474, the court discussed the application of *Roys v. First Nat. Bank, supra,* stating that it was not improper for a district attorney to appear as a witness where, at the very end of the trial, the district attorney was confronted with a situation which "left him in doubt as to the proper course for him to pursue" when he posed the problem to the court and was given permission to testify. The court, however, pointed out that the district attorney did not argue the credibility of his own testimony. He made very little reference to the incident in question.

Again, in *Interior Woodwork Co. v. Buhler* (1932), 207 Wis. 1, 9, 238 N. W. 822, the lawyer's appearance in the dual capacity of counsel and witness was condemned, and the case pointed out that such conduct was condonable only under circumstances where the necessity of counsel's testimony became apparent after the trial began.

In the *Estate of Weinert* (1962), 18 Wis. 2d 33, 36, 117 N. W. 2d 685, counsel, who was attorney for the executor, appeared as a witness to the execution of the will. The court held that, although such conduct was improper, the testimony was competent and, moreover, there was no necessity for reversal because the testimony of other attesting witnesses was sufficient. The court referred to *Will of Cieszynski* (1932), 207 Wis. 353, 241 N. W. 364, and *Estate of Stronks* (1961), 14 Wis. 2d 356, 363, 111 N. W. 2d 71. These cases quoted with approval from 3 Jones, *Evidence, Civil Cases* (4th ed.), p. 1360, sec. 754. The Jones citation pointed out that while no *rule of law* prohibits the attorney from testifying:

"In some cases, it may be unseemly, especially if counsel is in a position to comment on his testimony; and the practice has often been severely criticized by the courts. It has even been held to be reversible error to permit an attorney to continue to act as such after having testified for his client." *Estate of Weinert, supra,* page 37.

In the 1963 case of *Mack Trucks, Inc. v. Sunde* (1963), 19 Wis. 2d 129, 135, 119 N. W. 2d 321, Canon 19 was again discussed, and the court concluded that it would not have been improper to permit a law partner of the attorney conducting the case to testify in regard to a purely formal matter—that a registered letter was sent and that the receipt thereof was acknowledged.

In *Jensen v. Heritage Mut. Ins. Co.* (1964), 23 Wis. 2d 344, 127 N. W. 2d 228, the court declined to decide whether the trial court erred in refusing to permit an attorney participating in the trial to testify in respect to the signing of a statement. It was determined that the exclusion of the statement itself was not prejudicial and that, therefore, the exclusion of the attorney's testimony in regard thereto was not prejudicial.

In *Kink v. Combs* (1965), 28 Wis. 2d 65, 135 N. W. 2d 789, over the objection of counsel that there was a violation of Canon No. 19, a law firm associate of trial counsel was permitted to testify in regard to the authenticity of an exhibit. We concluded, following the reasoning of *Mack Trucks, supra,* that the testimony which was permitted in the *Kink Case* was within the exception permitted by the canon, that is, a formal matter pertaining to custody of an exhibit. Moreover, the attorney testifying as to such exhibit did not otherwise participate in the case.

The principles of the Wisconsin cases above were discussed in *Peterson v. Warren* (1966), 31 Wis. 2d 547, 568, 569, 143 N. W. 2d 560. In that case one of the attorneys was called adversely during the course of trial and, in addition, there was no evidence that he knew in advance that he would be required to testify. Under those

circumstances, this court concluded that the conduct was not improper under the circumstances and that what happened was not the evil that Canon 19 sought to guard against.

In the more recent case, *Chapman v. Keefe* (1967), 37 Wis. 2d 315, 322, 155 N. W. 2d 13, the court held it was error, sufficient to reverse a judgment, for counsel to state prejudicial facts not in evidence.

Perhaps the best general statement of the role of a counsel in an adversary system and the limitations that the system imposes upon counsel appears in *Brown v. Swineford* (1878), 44 Wis. 282, 293, 294. Therein Mr. Chief Justice EDWARD G. RYAN stated:

"It is the duty of counsel to make the most of the case which his client is able to give him; but counsel is out of his duty and his right, and outside of the principle and object of his profession, when he travels out of his client's case and assumes to supply its deficiencies. Therefore is it that the nice sense of the profession regards with such distrust and aversion the testimony of a lawyer in favor of his client. It is the duty and right of counsel to indulge in all fair argument in favor of the right of his client; but he is outside of his duty and his right when he appeals to prejudice irrelevant to the case. Properly, prejudice has no more sanction at the bar than on the bench. But an advocate may make himself the *alter ego* of his client, and indulge in prejudice in his favor. He may even share his client's prejudices against his adversary, as far as they rest on the facts in his case. But he has neither duty nor right to appeal to prejudices, just or unjust, against his adversary, *dehors* the very case he has to try. The very fullest freedom of speech within the duty of his profession should be accorded to counsel; but it is license, not freedom of speech, to travel out of the record, basing his argument on facts not appearing, and appealing to prejudices irrelevant to the case and outside of the proof. It may sometimes be a very difficult and delicate duty to confine counsel to a legitimate course of argument. But, like other difficult and delicate duties, it must be performed by those upon whom the law imposes it. It is the duty of the circuit courts, in jury trials, to interfere in all proper cases of their own motion. This is due to truth

and justice. And if counsel persevere in arguing upon pertinent facts not before the jury, or appealing to prejudices foreign to the case in evidence, exception may be taken by the other side, which may be good ground for a new trial, or for a reversal in this court."

Measuring the conduct of defense counsel herein against the standard of the Wisconsin cases that caution against counsel's testifying or injecting into the case facts not properly before the jury, we are obliged to conclude that the conduct of defendants' counsel was highly prejudicial to the plaintiff's cause of action. In his cross-examination of Lorenz, he injected his own personal observations into the interrogations. He stated as a question, ". . . isn't it a fact that as *I* got out of the car that you got down and then stood alongside of your trailer?" (Emphasis supplied.) He then followed this up with the declarative statement, "That's what *I* saw." (Emphasis supplied.) He was then admonished that he could not continue with this line of questioning unless he wished to appear as a witness. Subsequently, after being told by the court that his questions were objectionable, defense counsel stated, *in the presence of the jury:*

"Your Honor, I would request the Court now, in view of the prior questions, that I be allowed to be sworn and testify as to my observations on this last Saturday afternoon at the dump here in Hudson with regard to my observations of Mr. Lorenz."

In the course of subsequent colloquy with the witness Lorenz, Attorney Fetzner gave the clear implication to the jury that it was on the basis of what he, Fetzner, had seen that he was attempting to judge the veracity of Lorenz. The prejudicial comments of counsel were consistently objected to, but nevertheless continued to be referred to.

Later in the trial, Attorney Fetzner's son testified that two men "were up in the trailer . . . unloading and

throwing stuff out." He testified that one man "got out" of the trailer, walked over to him and his father, and began talking. Fetzner's son identified this man as the plaintiff, Oliver Lorenz. There was nothing improper in respect to the very clear and convincing testimony of David Fetzner. However, during closing argument, attorney Fetzner made the following statements:

"Now, one very significant thing here going to the truth which I think is very, very important. It's important to a father who has two good eyes and it's also important because I think it tells the basis, again going to the fact of honesty, truth and good justice. This isn't something we learn in law school. Truth and honesty is something we have learned at home, that we were brought up with."

"But the crucial thing is, that my son David identified Mr. Lorenz."

"We have eyes. My son has two good eyes and *I* am satisfied, as sure as I am standing in front of you people, that Mr. Lorenz was in that trailer." (Emphasis supplied.)

It is apparent that, in this argument, he not only referred to the testimony of his son. In effect, he testified as to his own knowledge of his son's visual acuity and that he (Attorney Fetzner) was "satisfied, as sure as I am standing in front of you people, that Mr. Lorenz was in that trailer."

It is apparent that the entire course of counsel's handling of the dump incident evinced a consistent assertion that, because Attorney Fetzner saw the alleged conduct of Lorenz, such conduct in fact took place. The vice of this testimony is that Attorney Fetzner's own observations were not properly in evidence and he, by clear implication, attempted to measure the credibility of Lorenz against his own reputation for truth and veracity.

In view of the clear testimony of David Fetzner, we could, and would, not come to the conclusion that the assertions of Lorenz were true and those of Attorney Fetzner were false. The point, however, is that Attorney Fetzner's observations were not properly before the jury and should not have been placed before the jury in any form.

It should also be pointed out that the evidence which was presented by David Fetzner, and by implication by Attorney Fetzner, was of crucial importance in the case. If believed, it would tend to undermine the jury's confidence in Lorenz's credibility. It also tended to show that Lorenz was a malingerer and that his disability was not as severe as he claimed.

The significance of the dump incident was obviously clear to Attorney Fetzner before the start of the case. It would appear that the only proper course would have been, in advance of the trial, to determine to place reliance solely upon the testimony of David Fetzner in regard to the dump incident. It is understandable that, in the heat of a contested lawsuit, counsel, particularly when he feels that a witness is lying, seek to inject his own honest beliefs into the interrogation; but the method resorted to, over the continued objection of counsel and the admonitions of the court, resulted in the injection of highly prejudicial and unsworn testimony into the case.

We therefore conclude, without venturing to determine the truth of the matter in dispute, that the circumstances of this trial prevented a fair trial of the factual issues of the case. They improperly and by faulty trial technique improperly cast doubts upon the credibility of the plaintiff, and such credibility was crucial to the plaintiff's cause of action.

We therefore conclude that there was a probable miscarriage of justice in that the jury had before it evidence not properly admitted in the trial. Accordingly, the judgment must be reversed *in toto* in the interest of justice.

The plaintiff also points out that he was prejudiced by the habit of the judge, when there was an objection, to have the reporter read back the allegedly objectionable question in the presence of the jury before ruling on the objection. It is obviously not good judicial practice to repeat, or to have repeated, before the jury the very matter that objecting counsel wishes to have excluded. However, we see no evidence that such occasional lapses by the trial court were prejudicial.

The point is also raised that, during the course of the trial and on the very evening before the case went to the jury, the plaintiff suffered a severe convulsive seizure and was unable to be present in court on that last day. The trial court refused to permit any explanation of Lorenz's absence and declined to permit plaintiff's counsel to reopen his case for the purpose of showing that Lorenz sustained another epileptic-type seizure of the kind that plaintiff asserted were occasioned by the accident.

We conclude that it was error for the trial judge not to have permitted at least the summary explanation that Lorenz was ill and unable to be present. We do not, however, conclude that it was an abuse of discretion to deny plaintiff's motion for the reopening of the case so that a complete explanation of the new seizure could be put into the record. Standing alone, however, the judge's omission in this respect was not prejudicial to the degree that we would reverse an otherwise antiseptic trial. It is, however, a factor which could properly be considered in ordering a new trial in the interest of justice, although in the instant case the incident was insignificant when compared with the case as a whole.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

ROBERT W. HANSEN, J. (*dissenting*). The majority opinion is very flattering to the legal profession, very unflattering to the jury system.

Flattering to barristers should be the suggestion that, given trial counsel's indication that he saw the plaintiff on a trailer at a dump, the jury would not believe the sworn testimony of the plaintiff that he did not get up on the trailer, and might then conclude the testimony of the plaintiff as to more material aspects of the case to be unworthy of belief.

Unflattering to jurors is the conclusion that a dispute between lawyer and litigant as to a very peripheral aspect of the case might distract the jury from considering and properly weighing the expert medical testimony on which the plaintiff's hopes for substantial recovery rested. Jurors are not kindergarten pupils this easily distracted. Jurors are mature and adult citizens, able to discard the irrelevant, particularly where they are admonished by the trial court so to do, and concentrate their attention on the material issues in a case. If they are not, the whole jury system rests upon a shaky foundation.

The objectionable and objected-to statements and questions of defense counsel involved only the question of whether the plaintiff was on or off the trailer at the dump, a matter of remote relevancy. On this phase of the trial, the trial court admonished the jury as follows:

"*The Court:* The court will instruct the jury as to any remarks made by Mr. Fetzner as to what he saw, are to be entirely disregarded. While counsel has a duty to ask questions, they themselves cannot testify as to facts that they know unless they wish to appear as witnesses. Mr. Fetzner has not at this point in the trial appeared as a witness, but merely as an attorney for the defense. Therefore, any statements that may have been made as in the form of being a witness are to be entirely disregarded."

Unless court admonitions to disregard are to be held to be invariably ineffectual, this should be held a sufficient erasure of the error, particularly where the trial court then asked plaintiff's counsel:

"*The Court:* Is counsel satisfied with the instruction?

*"Mr. Burns:* It's probably the best that can be done with a bad situation."

The majority opinion holds that it was not necessary for plaintiff's attorney to then and there move for a new trial to preserve the right to seek a new trial on the basis of the error committed. Under the holding, given this set of circumstances happening again, it would be prudent not to move for a new trial. Better to leave the depth charge undetonated, so that, if the jury verdict is adverse, a delayed detonation can be used to secure a new trial. However, here the plaintiff's attorney did not merely fail to make a motion for a new trial. He clearly accepted the court admonition to the jury to disregard as "the best" of the available alternative means of handling the situation. To impliedly suggest that the trial court should at that point have declared a mistrial would require the court do what neither plaintiff nor defendant requested or desired. Granting the new trial now is to permit plaintiff's counsel to have his cake—the continuance of the trial at the time of trial—and to eat a different cake—securing a new trial—on appeal.

Out of defense counsel's closing arguments, the majority opinion also finds error in counsel's observation that his nine-year-old son, who had testified as to the dump incident, ". . . has two good eyes," directly followed by his stating, ". . . and I am satisfied, as sure as I am standing in front of you people, that Mr. Lorenz was in that trailer." The majority opinion relates counsel's "satisfaction" back to his own presence at the dump when the trailer was being unloaded. It could as easily relate to his parental certainty that his son had told the truth when he was on the witness stand. In either case, the question should be not whether the remark was completely antiseptic but whether it fatally polluted the jury's consideration of the basic issue in the case. Where the basic issue revolved around and was in the area of the conflicting medical testimony, the writer would hold the remark, even if better left unsaid, not to be so

prejudicial to plaintiff to warrant or require the granting of a new trial. The central issue here did not relate to the dispute between litigant and lawyer as to what happened at the dump. It related almost solely to the dispute between the doctors who testified as to whether or not there was a linkage between the serious aneurysm condition and the minor traffic accident.

There is neither need nor reason to differ with the majority opinion as to the applicability of rule 19 of the Canon of Professional Ethics, and the thirteen cited cases dealing with it. However, obviously, care and caution should mark the penalizing of a litigant for errors of judgment of his counsel. Disciplinary rules are not most effectively enforced by penalizing clients. On occasion, it will be true that "The lawyer errs, so the client must suffer." But this should follow only where the error goes to the heart of the issue involved in the litigation or at least is related to highly pertinent and relevant aspects of the case. Being on or off the trailer at the dump is not such.

What the majority opinion does is to move a miniscule factor from the wings to the center of the stage. The plaintiff did not lose his case because the jury believed he got up on or stayed off the trailer at the dump. His case stood up or fell on the matter of the medical testimony presented. The jury found that there was a traffic accident, apportioned the fault and awarded damages to plaintiff for minor injuries therein sustained. It refused to find that his very serious aneurysm troubles were caused or aggravated by the minor accident in which he was involved. This was very much a matter of expert medical testimony and there is ample evidence from medical witnesses to support the jury verdict of non-linkage between aneurysm and accident.

Two treating physicians, Drs. Bourget and Bellormo, testified at the trial. Dr. Bellormo had treated the plaintiff as early as 1961 for fatigue and aching legs. He

testified as to a history of "occasional occipital-frontal headaches," and a diagnosis of migraine headaches prior to the accident. Dr. Bourget was visited by the plaintiff four days after the traffic accident here involved. He testified that plaintiff, on the first visit, complained of pains in his neck and lower back, on a second visit of neck pains only. Dr. Bourget testified that the plaintiff made no mention of headaches, and that he had no reason to believe the plaintiff was suffering from an aneurysm.

It is true that another treating physician, neurosurgeon Dr. Merrick, answering a hypothetical question, testified that there could be such causal relationship between accident and aneurysm. However, he had earlier given his opinion in writing to be that:

"It is impossible for me to say with any degree of medical certainty that the accident which he sustained in January of 1963 was the cause of the aneurysm for which I treated him at the Miller Hospital in April of 1963. As I explained to him, the only time I can directly associate such things as an accident and an aneurysm is when there is a severe onset of symptoms, either a neurological deficit or an intercranial hemorrhage, and when the symptoms appear within five minutes after a significant accident which could cause such symptoms. I do not feel that this is the case in Mr. Lorenz's situation."

Gallows confessions may be highly persuasive, but courtroom conclusions are not necessarily to be preferred to earlier medical analyses by the same doctor as to a patient's difficulties and their cause. Given two conflicting diagnoses by the same medical witness, it was for the jury to decide which was to be accepted.

It is likewise true that, where there are differences in the experts' testimony as to the causation or aggravation of an aneurysm by an accident, it is for the jury to make the decision as to which medical testimony is to be accepted and to decide whether such causation or aggravation was established. Here the jury found that the

aneurysm had nothing to do with the accident. There is ample medical testimony to sustain such finding.

The written brief on appeal of plaintiff-appellant begins with this statement:

"We do not claim that the evidence was so overwhelming that the jury could not find, as it did, that Lorenz failed to meet the burden of proof that the aneurysm was causally related to the accident."

The writer agrees.

The failure to meet the burden of proof as to causal relationship came in the area of the medical expert testimony. The jury finding of nonlinkage between aneurysm and accident was not based on accepting or rejecting the testimony of the plaintiff. It was based on the testimony of physicians who had treated the plaintiff and found no connection between the accident and the aneurysm. The case hinged on the testimony of the doctors. It did not hinge on what happened at the dump. There was ample medical evidence to sustain the finding of the jury that the accident and the aneurysm were unrelated. The judgment should be affirmed.

I am authorized to state that Mr. Justice BRUCE F. BEILFUSS concurs in this dissenting opinion.